# United States Tax Court

T.C. Memo. 2025-83

CFM INSURANCE, INC.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

ROBERTINO PRESTA AND ANTONELLA PRESTA,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 10703-19, 10704-19.                Filed August 4, 2025.

————

*Jonathan A. Halmi*, *Tim Alan Tarter*, and *Kacie N.C. Dillon*, for petitioners.

*Elizabeth A. Carlson*, *Michael T. Shelton*, *Evan K. Like*, and *Steven L. Williams*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 4

FINDINGS OF FACT .................................................................. 5

I.   Background ....................................................................... 5

II.  Caputo's Moves to Captive Insurance ............................ 9

III. Caputo's Commercial Insurance .................................... 12

**Served 08/04/25**

2

[*2]

IV. CFM's Policies ............................................................... 12

   A. 2012 ...................................................................... 15

   B. 2013 ...................................................................... 17

   C. 2014 ...................................................................... 17

   D. 2015 ...................................................................... 19

V. Claims ......................................................................... 21

VI. Insurance Policies in General ...................................... 21

VII. Calculating CFM's Premiums ...................................... 22

VIII. How Things Went ...................................................... 25

IX. The Returns ............................................................... 26

   A. CFM's Returns ...................................................... 26

   B. The Prestas' Returns ............................................. 26

X. Audit, Petitions, and Trial .......................................... 30

OPINION ........................................ **Error! Bookmark not defined.**

I. The Parties' Arguments ............................................... 32

II. McCarran-Ferguson Act ............................................... 32

III. Whether This Was Insurance ...................................... 35

   A. Risk Distribution .................................................. 35

      1. Safe Harbor ...................................................... 37

      2. Independent Risk Exposures ........................... 38

         a. Exposure Units ........................................... 38

            i. Customer Transactions ..................... 39

            ii. Products Sold ................................... 41

[*3]

            iii.   Major Equipment ............................................. 41

            iv.   Computer Logins .............................................. 42

            v.    Employees ........................................................ 42

            vi.   Key Employees ................................................. 42

            vii.  Regulatory Changes ......................................... 43

            viii. Store Location .................................................. 43

            ix.   Suppliers .......................................................... 43

            x.    Unrelated Tenants ........................................... 44

            xi.   Insured Entities and Policies ........................... 44

      b.   Were the Risk Exposures Independent? ................. 44

            i.    Number of Entities .......................................... 45

            ii.   Geographic Diversity ....................................... 46

            iii.   Diversity of Industry ....................................... 46

            iv.   Revenue as a Proxy for Risk ........................... 47

            v.    Independence of Policies ................................. 48

      c.   Were the Independent Risk Exposures Sufficient? 48

  B.   Commonly Accepted as Insurance ......................................... 51

    1.   Formal Operation ................................................... 52

    2.   Premium Calculations ............................................ 52

    3.   Valid and Binding Policies ..................................... 56

      a.   Untimely Policies ..................................... 57

      b.   Ambiguity ................................................ 59

    4.   Claims Handling ..................................................... 60

**[\*4]**

      a.    CFM's Procedure ...................................................... 60

      b.    CFM's Claims Processing in Reality ....................... 60

   5.    Absentee Owners ............................................................ 62

   6.    Due Diligence ................................................................. 62

IV.  Unwinding the Transaction ........................................................ 63

V.  Penalties ..................................................................................... 66

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, *Judge*: Robertino and Antonella Presta own a local chain of grocery stores in the Chicago area. In 2012 they formed a microcaptive insurance company, CFM Insurance, Inc. (CFM), under Utah law and began sending it just shy of $1.2 million in premiums each year. We've seen this before in *Avrahami*,[1] *Syzygy*,[2] *Reserve Mechanical*,[3] *Caylor*,[4] *Keating*,[5] *Swift*,[6] and *Patel*.[7]

In each of those cases, we found that the microcaptive insurer wasn't really an insurance company. The Prestas argue that CFM is different.

They may be right.

---

[1] *Avrahami v. Commissioner*, 149 T.C. 144 (2017).

[2] *Syzygy Ins. Co. v. Commissioner*, 117 T.C.M. (CCH) 1165 (2019).

[3] *Rsrv. Mech. Corp. v. Commissioner*, 115 T.C.M. (CCH) 1475 (2018), *aff'd*, 34 F.4th 881 (10th Cir. 2022).

[4] *Caylor Land & Dev., Inc. v. Commissioner*, 121 T.C.M. (CCH) 1205 (2021).

[5] *Keating v. Commissioner*, T.C. Memo. 2024-2.

[6] *Swift v. Commissioner*, T.C. Memo. 2024-13, *aff'd*, No. 24-60270, 2025 WL 1949147 (5th Cir. July 16, 2025).

[7] *Patel v. Commissioner*, T.C. Memo. 2024-34.

[*5]                    FINDINGS OF FACT

I.    *Background*

Angelo and Romana Caputo grew up in a village on the southeast coast of Italy. While still a young man, Angelo learned that he was a dual Italian-American citizen. He joined the United States Army, completed basic training in Chicago, and shortly after was stationed as a cook on a military base in Germany. Angelo traveled while on furlough back to his home village where he quickly courted and married Romana. He completed his service, and the newlyweds sank roots in Illinois and opened a 3,750-square-foot store in Elmwood Park called Caputo's New Farm Produce (Caputo's). The store soon became known for fresh produce and delicious Italian baked goods.

The Caputos also produced a daughter they named Antonella. Antonella grew up in the store. And as the store prospered Angelo began hiring outside the family. One of his new employees was Robertino Presta, who started working at the store when he was only 13 years old. Like Antonella, Robertino's parents had also immigrated to the United States from Italy—his father worked as a tailor and his mother as a beautician. Smitten by his coworker, Robertino secured Angelo Caputo's permission to ask Antonella to the prom. The pair has been together ever since.

Business was good. In 1979 the Caputos began to expand the store, and within three years it almost doubled in size. Several years later, the extended Caputo family mixed business with pleasure when they toured some old-world manufacturers during a vacation to Italy. This visit inspired them to create their own line of food products which they called La Bella Romana. The first La Bella Romana products included peeled, pureed, and crushed tomatoes, but the line expanded to olive oils, pastas, and hot-and-ready meals.

Angelo Caputo was looking to retire by 1988 but wanted to keep the business in the family. He worked out a deal with his daughter and son-in-law to have them take over. Once they were in charge, the Prestas expanded the business by buying other stores and opening some new ones. They set up each new store as a separate Illinois corporation, each of which they jointly owned. By 2015 the Prestas owned and operated:

**[\*6]**

| Name | Year Formed | Square Footage of Retail Space as of 2014 |
|---|---|---|
| Caputo's New Farm Produce, Inc. (i.e., the Elmwood Park store) | 1979 | 50,000 |
| Caputo's New Farm Produce–Addison, Inc. | 1991 | 40,000 |
| Caputo's New Farm Produce–Hanover Park, Inc. | 1996 | 38,000 |
| Caputo's New Farm Produce–Bloomingdale, Inc. | 2004 | 38,000 |
| Caputo's New Farm Produce–Naperville, Inc. | 2006 | 70,000 |
| Caputo's New Farm Produce–South Elgin, Inc. | 2007 | 65,000 |
| Caputo's New Farm Produce–Carol Stream, Inc. | 2014 | 85,000 |
| Caputo's New Farm Produce–Downers Grove, Inc. | 2014 | Unknown |

As the number of stores grew, so did what they sold: A full-service meat department, fish department, café, and bakery were some of the new features the one-time mom-and-pop produce market began to provide customers. Each store eventually sprouted a 30-foot-long food counter to serve La Bella Romana hot meals. La Bella Romana itself flourished, and by 2012 the company boasted of more than 500 different products.

As the business grew horizontally, it began to grow vertically. The Prestas formed LBR Importing & Distributing, Inc., to deal directly with sellers, and LBR Construction, Inc., to be the general contractor remodeling Caputo's stores and obtaining building permits and construction supplies.

The Prestas also slowly began to increase their storage facilities. They bought a 20,000-square-foot warehouse in Elmhurst in the 1990s. In 1999 they upgraded to a 60,000-square-foot warehouse in Addison equipped with two 6,000-gallon underground fuel tanks for Caputo's to use for their trucks. Despite being three times the size of the previous warehouse, the business again outgrew the space and in 2007 the Prestas sought to acquire a 300,000-square-foot building on a 30-acre site in Carol Stream. They planned to expand their production of

[*7] prepared foods at that central location, carve out 85,000 square feet for retail space, and use the rest as a corporate office. They finished this giant project between late 2012 and early 2013. The warehouse had 20 cooler rooms, a freezer capable of holding 1,000 pallets, and areas dedicated to sausage making and meat packing.

In 2012 the Prestas incorporated an Illinois limited liability company to own the warehouse and rent some space in it to the stores. The Prestas also cultivated a habit of buying shopping centers and renting out the flagship store to a Caputo's. They would routinely rent out the remaining storefronts to other retailers. The result was a healthy real-estate portfolio, which they planted in R&A Real Estate Holding, LLC,[8] a holding company for all of their other ventures. It was jointly owned by the Prestas and the Prestas' gift trusts.

By 2013 the Prestas held the following real-estate entities:

| Name | Year Formed | Purpose |
|---|---|---|
| RAP Kennyville, LLC | 2011 | Owned real estate and held land for investment. |
| R&A Real Estate Holding, LLC | 2012 | Holding company for Prestas' real-estate entities. |
| 1811 W. Fullerton, LLC | 2011 | 60,000-square-foot warehouse rented out to Caputo's before the completion of the Carol Stream warehouse in 2013. After the completion of the Carol Stream warehouse, this location was rented out to a third-party liquor vendor. |
| 2449 N. 72nd, LLC | 2011 | Owns a six-flat apartment building. The property included a parking garage that hindered delivery trucks from getting in and out of the loading dock on the Elmwood Park store. After the Prestas purchased the complex, the parking garage was removed. |
| 2560 Harlem, LLC | 2011 | Rented the building to the Elmwood Park store until 2009 when it moved location. It then rented to commercial tenants including Planet Fitness from 2012–15. |
| 2601 Harlem, LLC | 2011 | Owns the parking lot for the 2560 Harlem location. |

---

[8] The Prestas formed this holding company in 2012.

| [*8] *Name* | *Year Formed* | *Purpose* |
|---|---|---|
| 2605 Harlem, LLC | 2011 | Commercial real-estate rental to unrelated tenants. |
| 3115 111th Street, LLC | 2011 | Rented a building to the Naperville store as well as unrelated tenants. |
| 510 Lake Mill Plaza, LLC | 2011 | Rented part of the shopping center to the Addison store. The remaining storefronts were leased to approximately 15 tenants including a dress shop, a dentist's office, a gambling venue, and a restaurant. |
| 520 East North Avenue, LLC | 2011 | This building housed the warehouse, corporate office, and Carol Stream store location. There were also five or six unrelated tenants including American Mattress, T-Mobile, a dentist's office, and a Sports Clips. |
| 606 Roselle, LLC | 2011 | This property was commercial real estate and was rented to unrelated tenants each year. |
| 7200 Harlem, LLC | 2009 | Landlord to the Elmwood Park store; began renting its building after it moved out from 2560 Harlem location. |
| Greenbrook Plaza, LLC | 2011 | Rented part of a shopping center to the Hanover Park Store. There were 20 unrelated tenants which included a cosmetology school, a Polish deli, a cigar shop, a sports pub, a gym, a camera shop, and a liquor store. |
| Lake Street Plaza, LLC | 2001 | Rented part of the shopping center to South Elgin Store. There were approximately 30 tenants, including an LA Tan, Chili's, a mobile store, Massage Envy, a Japanese hibachi restaurant, a gym, and GNC. |

What started as a local grocery store had grown into an empire. The average gross revenues for the holding company alone were over $6 million between 2012 and 2015. As for the Caputo's stores, the numbers speak for themselves.

**[*9]**

| Caputo's Store | Average[9] Gross Revenue | Total Depreciable Assets in 2012 (Other than Leasehold Improvements) |
|---|---|---|
| Elmwood Park Store | $31,380,471 | $6,291,643 |
| Addison Store | 19,352,635 | 2,894,876 |
| Hanover Park Store | 17,580,270 | 2,853,664 |
| Blooomingdale Store | 17,611,110 | 1,918,185 |
| Naperville Store | 29,218,835 | 2,289,351 |
| South Elgin Store | 19,446,513 | 2,064,753 |
| Carol Stream Store[10] | 13,044,598 | 4,703,152 |
| Downers Grove Store[11] | 13,582,006 | 1,230,724 |

## II.     Caputo's Moves to Captive Insurance

The Prestas' operations contained inherent risk, so naturally they obtained commercial insurance coverage for the grocery stores, warehouse, construction company, and some of their real-estate entities. Starting in 2003, they worked through Steve Gabinski, an insurance broker at Arthur J. Gallagher Risk Management Services, Inc. (Gallagher). Gabinski has worked at Gallagher for over thirty years and holds an insurance license in property casualty, benefits, and major medical. He specializes in food retailers and is an endorsed broker for the Illinois Food Retailers Association.

The Prestas came to Gabinski when they were looking to expand into their 300,000-square-foot space in Carol Stream, to talk about the potential risks they faced with the expansion and the coverage options

---

[9] All averages are for the years at issue.

[10] Amounts listed for total depreciable assets are from its return for the 2014 tax year.

[11] Amounts listed for total depreciable assets are from its return for the 2014 tax year.

**[*10]** that were available. These concerns centered on product-recall, food-contamination, and food-born illness liability. Gabinski attempted to find coverage for product recall and spoilage in the commercial market, but that such coverage was limited and prohibitively expensive. He suggested that the Prestas consider forming a captive insurance company to provide coverage for product recall and spoilage as well as to fill in coverage gaps with their existing commercial policies.

There was also undoubtedly an internal marketing opportunity here for Gabinski. Gallagher had a division called Artex Risk Solutions, Inc. (Artex), that formed and operated captive insurers.[12] Gabinski set up an informational meeting to discuss captive insurance for several of Gallagher's clients, including the Prestas. He set the meeting for February 2012, and it was hosted by Artex's Jeremy Huish.

After the meeting, Robertino Presta reached out to Huish to set up a call with Huish himself and two of his CPAs. In May 2012, Huish went to the Carol Stream store where he met with Presta and Caputo's CFO Jim Iovino. Presta showed Huish around the facility and introduced him to the Caputo's operation. After the meeting, Presta called Ross Pearlstein, one of his accountants, to see what he thought of moving forward with the captive.[13]

In June 2012 Caputo's[14] agreed to pay Artex $10,000 to conduct a feasibility study. In July 2012, before that study was completed, Iovino signed an Insurance Company Management Agreement whereby Artex was retained to operate the captive insurance company. The feasibility study was completed in August 2012. Later that month Gabinski told Artex that Caputo's would like to include employment practices liability coverage as part of the captive since their premiums for commercial coverage had increased by a factor of five. A few days later, Artex's

---

[12] For those keeping track of our microcaptive-insurance jurisprudence, Artex was also involved in *Caylor*, 121 T.C.M. (CCH) at 1208 n.5, and *Keating*, T.C. Memo. 2024-2.

[13] The Commissioner claims that the agreement to form the captive had been struck right after the meeting. He cites an email Iovino sent to Gabinski where he wrote: "I THOUGHT WHEN WE ENDED THAT THE CREATION OF A CAPTIVE WAS A GO" after the meeting with Huish. We do not find that there were any binding agreements in place at that time. Gabinski sent an email to Iovino later on to confirm that Artex should move forward with putting together a feasibility study.

[14] The agreement identifies "Angelo Caputo's Fresh Markets" as the company contracting with Artex.

**[\*11]** director of underwriting, Debbie Inman, revised the coverage proposal to add the employment practice liability coverage.[15]

With the updates in place, Artex began setting up the captive insurance company on behalf of Caputo's and named it CFM. The feasibility study cited Utah as the best place to incorporate CFM because it was an onshore domicile, had a low capital requirement, and had favorable regulatory guidelines.[16] Utah also offered maximum flexibility in paying dividends for its captives.[17]

Utah also requires a member of the captive insurer's board be a full-time Utah resident. Artex recommended appointing Ted Lewis, a Utah lawyer, to CFM's board. The Prestas agreed and, together with Lewis and their own son, Giancarlo, they made up CFM's four-person board. In addition to being directors, the Prestas each owned a 50-percent interest in CFM, and Robertino Presta was its president.

The Utah Insurance Department issued a certificate of public good for CFM effective October 2012, and the Utah Department of Commerce issued a certificate of registration to CFM in November 2012. Artex submitted to the Utah Insurance Department CFM's articles of incorporation, bylaws, and articles of organization in that same month.

---

[15] Inman accomplished this by decreasing the administrative and crisis-management coverage policy limits. *See infra* p. 16.

[16] The report identified Utah as a preferred place to set up CFM since it was a "state government friendly to business development, no premium taxes, easy access to regulators and legislators, online application process, commitment to technological advancements, reasonable and effective regulatory environment, favorable statutes, access to quality service providers, Salt Lake City is home to an international airline hub and is a central location for western states."

Domestic incorporation makes CFM different from many of the microcaptives that have come before our Court. *See Avrahami*, 149 T.C. at 149 (insurer incorporated in St. Kitts); *Rent-A-Center, Inc. v. Commissioner*, 142 T.C. 1 (2014) (insurer incorporated in Bermuda); *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1475 (insurer incorporated in Anguilla); *Caylor*, 121 T.C.M. (CCH) at 1208 (insurer incorporated in Anguilla). *But see Securitas Holdings, Inc. & Subs. v. Commissioner*, 108 T.C.M. (CCH) 490 (2014) (insurers incorporated in Ireland and Vermont); *Syzygy*, 117 T.C.M. (CCH) 1165 (insurer incorporated in Delaware); *Jones v. Commissioner*, T.C. Memo. 2025-25 (insurer incorporated in Montana).

[17] The maximum flexibility of dividends was a reason for incorporating in Utah in the first draft of the feasibility study drafted by Artex but wasn't listed as a reason in the final draft.

**[\*12]** III.   *Caputo's Commercial Insurance*

By the end of 2012, the various Caputo's in conjunction with the Prestas' other companies had the following commercial insurance coverage:[18]

| Provider | Type of Coverage | Premium Plus Fees | Aggregate Policy Limits | Deductible |
|---|---|---|---|---|
| Argonaut | Auto | $40,380 | $1,000,000 | $1,000 |
| Executive Risk | Employment Practice Liability | 18,100 | 1,000,000 | 10,000 |
| Argonaut | Crime/General Liability/Inland Marine/Property | 185,666 | 5,000,000 | 2,500 |
| Argonaut | Commercial Umbrella | 26,537 | 10,000,000 | 10,000 |
| Argonaut | WC/ER Liability | 344,852 | 500,000 | -0- |
| Indiana/American Fire | Property/General Liability | 3,982 | 2,000,000 | 1,000 |
| Indiana/Ohio Casualty | Commercial Umbrella | 2,523 | 5,000,000 | 10,000 |
| Maxum | General Liability | 18,000 | 2,000,000 | 5,000 |
| Hanover/Citizens | Businessowner's | Unknown | 4,000,000 | 1,000 |
| Phoenix/Travelers | Equipment Breakdown | 4,210 | 52,821,948 | 2,500 |
| Maxum | General Liability | 18,000 | 2,000,000 | 5,000 |
| **Total** | | **$662,250** | **$85,321,948** | **$48,000** |

Though the policies and premiums varied from year to year, the Commissioner does not contest deductibility of any of the premiums that Caputo paid for any of these commercial insurance policies.

IV.   *CFM's Policies*

CFM's policies with Caputo's were somewhat different.   In general they had a coverage period of January 1 of one year through until January 1 of the next, and were evergreen.  This meant that they

---

[18] The policies listed in the chart had named insured extensions which included several of the Caputo's stores, real-estate holdings, and support entities related to the grocery store's operation.

**[\*13]** stayed in effect until they were canceled and they were automatically renewed each year. They identified the insured as Caputo's New Farm Produce, Inc. (Caputo's New Farm). The Prestas' other companies (Caputo's entities) were also covered by the policies.[19] For each year, CFM provided Caputo's New Farm with either a policy summary or renewal which outlined the provisions of the policies. As Artex was contracted to operate the company, its underwriters would annually gather information from the insured entities including exposure and gaps in commercial coverage. Gabinski acted as a consultant to Caputo's during the captive renewal process. He annually reviewed the policies and discussed them with Presta and Iovino. They considered the adequacy of the coverage limits and decided whether specific policies were necessary.

During the years at issue Caputo's New Farm had various combinations of the following policies with CFM:

- *Administrative Actions*: Covered losses resulting from investigations, hearings, proceedings, or appeals held or initiated by local, county, state, or federal governmental agencies or programs. Covered losses included professional fees and expenses, assessments, fines, penalties, and sanctions.

- *Business Interruption Difference in Conditions (DIC)*: Covered expenses incurred or reduction of net income due to a covered cause of loss, which included, but not limited to, weather conditions, dishonest acts of employees, strikes, riots, disruptions of computer systems, pollution events, and government-ordered shutdowns.

---

[19] The following entities were covered by the 2012 and 2013 policies: Caputo's New Farm Produce, Inc.; 1811 W. Fullerton, LLC; 2449 N. 72nd, LLC; 2560 Harlem, LLC; 2601 Harlem, LLC; 2605 Harlem, LLC; 3115 111th Street, LLC; 510 Lake Mill Plaza, LLC; 520 East North Avenue, LLC; 606 Roselle, LLC; 7200 Harlem, LLC; Caputo's New Farm Produce–Addison, Inc.; Caputo's New Farm Produce–Bloomingdale, Inc.; Caputo's New Farm Produce–Carol Stream, Inc.; Caputo's New Farm Produce–Hanover Park, Inc.; Caputo's New Farm Produce–Naperville, Inc.; Caputo's New Farm Produce–South Elgin, Inc.; Greenbrook Plaza, LLC; Lake Street Plaza, LLC; LBR Construction, Inc.; LBR Importing & Distributing; and RAP Kennyville, LLC.

The 2014 and 2015 policies added both R&A Real Estate Holdings, LLC, and Caputo's New Farm Produce–Downers Grove, Inc., to the list.

**[\*14]**

- *Collection Risk*: Covered losses from outstanding accounts receivable that could not be collected.

- *Crisis Management/Reputation Risk*: Covered expenses arising from, or relating to, defending the reputation of the insured, included expenses incurred to defend the reputation of a grocery store if it sold bad product.

- *Employment Practices Liability*: Covered losses incurred as a result of a claim by an employee for wrongful termination, negligent supervision, harassment, and discrimination, among other reasons.

- *General Liability DIC*: Covered gaps or exclusions in the commercial policy, such as damage to product, nonemployee related discrimination, and mold.

- *Legal/Litigation Expenses*:[20] Covered professional fees and expenses resulting from a legal process against, or claims brought on behalf of, the insured entities.

- *Loss of Key Customer*: Covered losses resulting from the termination or suspension of a business relationship between the insured entities and a customer.[21]

- *Loss of Key Employee*: Covered the loss of a key employee if he were to resign, die, become disabled, breach his employment contract, be dismissed for cause, or lose his license to conduct business on an insured's behalf.[22]

---

[20] This policy was changed from a legal-expense policy to a litigation-expense policy effective January 1, 2013.

[21] For 2013 the policy was amended to include only those customer relationships that represented 5% or more of any insured entity's annual gross and net income.

[22] In 2013 the policy was amended to include only loss of those employees which would result in the loss of net income or increased expense of at least 5% of annual gross income of the applicable insured.

**[\*15]**

- *Loss of Key Supplier*: Covered losses due to the termination of a business relationship between an insured entity and a third party providing goods or services under a written agreement.[23]

- *Mechanical Breakdown DIC*: Covered losses, not covered under a commercial insurance policy, resulting from the failure, cracking, malfunction, or breakdown of mechanical equipment.[24]

- *Product Recall*: Covered losses resulting from the recall or withdrawal from the market or use by any person of the products prepared or sold by the grocery stores.

- *Network Security & Privacy Liability*: Covered replacement or restoration of electronic data, losses from extortion threats, and loss of business income or extra expense from an "E-commerce incident."

- *Regulatory Change*: Covered losses resulting from any changes made by governmental agencies or regulatory bodies affecting the insured's business and increasing operating expenses, reducing production capacity, or requiring the withdrawal of a product from the market.

A.     *2012*

CFM sent Caputo's New Farm a list of prospective coverages in August 2012, and Robertino Presta signed it in October 2012, completing the deal. Though the proposal did not specify what risks each policy covered, the Prestas contend that it acted as a "binder", by which they mean that the proposal was confirmation that the policies were in place before the policy documents were drafted and sent to them.

These were twelve policies that were supposedly in place in late 2012:

---

[23] In 2013 the policy was amended to include only loss of those suppliers which would result in loss of net income or increased expense of at least 5% of annual gross income.

[24] In 2013 the policy was amended to include business interruption and extra expense resulting from equipment inoperable due to utility interruption.

**[*16]**

| Policy Name | Premium | Limit | Rate on Line[25] | Percent of Total Premiums |
|---|---|---|---|---|
| Administrative Actions | $84,127 | $250,000 | 33.65% | 7.02% |
| Collection Risk | 30,560 | 300,000 | 10.19 | 2.55 |
| Crisis Management/Reputation Risk | 86,955 | 750,000 | 11.59 | 7.25 |
| Employment Practices Liability | 42,500 | 300,000 | 14.17 | 3.45 |
| General Liability DIC | 74,347 | 500,000 | 14.87 | 6.20 |
| Legal Expense | 90,739 | 1,000,000 | 9.07 | 7.57 |
| Loss of Key Customer | 40,306 | 200,000 | 20.15 | 3.36 |
| Loss of Key Employee | 130,607 | 1,000,000 | 13.06 | 10.89 |
| Loss of Key Supplier | 254,528 | 1,000,000 | 25.45 | 21.23 |
| Mechanical Breakdown DIC | 57,987 | 500,000 | 11.60 | 4.84 |
| Product Recall | 196,953 | 1,000,000 | 19.70 | 16.42 |
| Regulatory Change | 109,527 | 1,000,000 | 10.95 | 9.13 |
| **Total** | **$1,199,136** | **$7,800,000** | — | — |

The Prestas' stated understanding may be important because CFM didn't issue the actual policies listed in the coverage proposal until January 2013—several weeks after the coverage period had ended. Endorsements and declarations in the policies outlined the policy-specific provisions, as well as general terms and conditions.

The payment of premiums was a bit odd as well. PRS Insurance (PRS), a company controlled by Artex, issued an invoice to Caputo's New Farm dated November 12, 2012, for $1,199,136. Even though the invoice did not identify a specific due date, it provided for semiannual, quarterly, and monthly payment plans and set forth the amount due under each plan. Caputo's New Farm did not wire PRS the $1,199,136 payment until December 2012.

---

[25] The rate on line is the premium divided by the occurrence limit.

**[\*17]** B.    *2013*

Since the 2012 policies contained an evergreen provision, they were automatically renewed for 2013.  The premiums, limits, and rates for each of the types of policies were identical to those of 2012.  The binder for the 2013 coverage year was sent out on January 23, 2013.  But CFM didn't issue the renewal endorsements for the 2013 captive policies until December 27, 2013, a mere four days before the end of the coverage period.  As with the 2012 endorsement, this document identified the general terms and conditions that governed the captive policies.  The legal-expense, loss-of-key-customer, loss-of-key-employee, loss-of-key-supplier, and mechanical-breakdown DIC policies for 2013 also had a revised endorsement with new provisions specific to those policies.

PRS issued to Caputo's New Farm an invoice for $1,199,136 on January 23, 2013, and like the 2012 invoice, it had no specified due date; but the same semiannual, quarterly, and monthly payment options were listed.  Caputo's New Farm paid the premium only in December 2013, shortly before the end of the policy year.

C.    *2014*

While the evergreen provision meant that the policies from 2013 were automatically renewed, the binder for 2014 was sent only in May.  But Caputo's New Farm rejiggered the policies.  CFM canceled the loss-of-key customer and loss-of-key employee policies in July 2014, albeit with a supposed retroactive cancellation date of January 1, 2014.  That same day, CFM issued the 2014 renewal endorsements for the remaining policies containing their terms and conditions, as well as an unnumbered endorsement that changed the policy numbers.  It even revised policy-specific provisions of the administrative actions, collection risks, general-liability DIC, litigation-expenses, loss-of-key-employee, mechanical-breakdown DIC, product-recall, and regulatory-change policies.  CFM also issued a new policy—the business-interruption DIC policy—which it had not issued for 2012 and 2013.

We summarize:

[*18]

| Policy Name | Premium | Limit | Rate on Line | Percent of Total Premiums |
|---|---|---|---|---|
| Administrative Actions | $60,680 | $500,000 | 10.14% | 5.07% |
| Business Interruption DIC | 198,612 | 1,000,000 | 19.86 | 16.60 |
| Collection Risk | 47,186 | 300,000 | 15.73 | 3.94 |
| Crisis Management/Reputation Risk | 75,397 | 500,000 | 15.08 | 6.30 |
| Employment Practices Liability | 42,500 | 750,000 | 5.67 | 3.55 |
| General Liability DIC | 85,779 | 500,000 | 17.16 | 7.17 |
| Litigation Expense | 141,398 | 1,000,000 | 14.14 | 11.82 |
| Loss of Key Employee | 98,394 | 500,000 | 19.68 | 8.23 |
| Mechanical Breakdown DIC | 82,125 | 500,000 | 16.43 | 6.87 |
| Product Recall | 190,934 | 1,000,000 | 19.09 | 15.96 |
| Regulatory Change | 173,143 | 1,000,000 | 17.31 | 14.48 |
| **Total** | **$1,196,148** | **$7,550,000** | — | — |

Billing was again somewhat odd. PRS issued an invoice dated April 9, 2014 to Caputo's New Farm for $1,204,478 in premiums that would be owed under the 2014 policies that had not yet been written. The first 2014 invoice stated: "[P]ayment in full is due by expiration of the billing period shown above." The "billing period shown above" was January 1, 2014, through January 1, 2015. This continued to provide for semiannual, quarterly, and monthly payment options.

PRS then voided that invoice and sent Caputo's New Farm a second invoice in May 2014, for $1,196,148, a small but critical change in the total amount owed. *See infra* p. 26. This second invoice had the same payment terms as the first 2014 invoice, but listed different policies and premiums for the same 2014 coverage period:

**[*19]**

| Policy | *Premium Shown on April 4, 2014, Invoice* | *Premium Shown on May 19, 2014, Invoice* |
|---|---|---|
| Administrative Actions | $131,935 | $60,680 |
| Business Interruption DIC | n/a | 198,612 |
| Collection Risks | 44,939 | 47,186 |
| Crisis Management/Reputation Risk | 78,006 | 75,397 |
| Employment Practices Liability | 42,500 | 42,500 |
| General Liability DIC | 96,111 | 85,779 |
| Litigation Expense | 224,442 | 141,398 |
| Loss of Key Employee | 165,947 | 98,394 |
| Mechanical Breakdown DIC | 65,179 | 82,125 |
| Product Recall | 181,842 | 190,934 |
| Regulatory Change | 173,577 | 173,143 |
| **Total** | **$1,204,478** | **$1,196,148** |

In addition to the payment schedule on the invoice, the general terms and conditions applicable to the 2014 policies stated that the insured was "responsible for the payment of all premiums quarterly but in no event later than the expiration of the Coverage Period." Caputo's New Farm wired PRS $299,037 in July 2014 and the remaining $897,111 on December 29, 2014.

D.    *2015*

In January 2015, CFM canceled all of the existing policies effective January 1, 2015. This was not, however, because CFM had gone out of business. Instead, in May 2015, Inman issued a policy certificate which the Prestas assert acted as a binder for the new policies. But it was 2012 all over again. CFM did not issue the declarations for new captive policies until January 2016, with a purported effective date of January 2015. These declarations identified the general terms and conditions governing the policies, and they had

**[*20]** new endorsements since they were not renewal documents. This resulted in the following policies and coverage for 2015:

| Policy Name | Premium | Limit | Rate on Line | Percent of Total Premiums |
|---|---|---|---|---|
| Administrative Actions | $49,330 | $200,000 | 24.67% | 4.11% |
| Business Interruption DIC | 172,544 | 500,000 | 34.51 | 14.39 |
| Collection Risk | 47,186 | 300,000 | 15.73 | 3.94 |
| Crisis Management/Reputation Risk | 75,397 | 500,000 | 15.08 | 6.29 |
| Employment Practices Liability | 42,500 | 750,000 | 5.67 | 3.54 |
| General Liability DIC | 85,779 | 500,000 | 17.16 | 7.15 |
| Litigation Expense | 141,398 | 1,000,000 | 14.14 | 11.79 |
| Loss of Key Employee | 98,394 | 500,000 | 19.68 | 8.21 |
| Mechanical Breakdown Deductible Reimbursement (DR) | 3,496 | 10,000 | 3.50 | 0.29 |
| Mechanical Breakdown DIC | 82,125 | 500,000 | 16.43 | 6.85 |
| Network Security & Privacy Liability | 42,339 | 500,000 | 8.47 | 3.53 |
| Product Recall | 190,934 | 1,000,000 | 19.09 | 15.92 |
| Property DR | 2,033 | 5,000 | 8.13 | 0.17 |
| Regulatory Change | 165,568 | 750,000 | 22.08 | 13.81 |
| **Total** | **$1,199,023** | **$7,015,000** | — | — |

Cooper Mountain Assurance, Inc., a company controlled by Artex, issued Caputo's New Farm the 2015 invoice for $1,199,023 on May 22, 2015. The 2015 invoice provided for semiannual, quarterly, and monthly payment plans. CFM then modified the 2015 captive policies to remove the quarterly payment requirement that had been established in the 2014 captive policies. Caputo's New Farm wired CFM $1,199,023 just before the end of the policy year on December 28, 2015.

**[\*21]** V.     *Claims*

Artex was CFM's third-party administrator for claims, although it had no written guidelines for processing claims until late 2013 or early 2014.  Even then, what procedures it did have focused on how to physically process a claim rather than how to evaluate a claim's merits.

Artex also didn't have a claims department or any licensed claims adjusters for its various captive insurance companies until Chris Leavitt joined the company in 2014.  Leavitt was a licensed claims adjuster who worked on captive claims.  In 2015, Kevin Christy joined the team as another claims adjuster.  After that, Leavitt served as a claims manager.

VI.     *Insurance Policies in General*

A valid insurance policy must insure an insurable risk, shift the risk from the insured, and distribute risk.  *See Helvering v. Le Gierse*, 312 U.S. 531, 539–40 (1941).  As the Prestas' expert Professor Michael Angelina explained, an insurable risk is one that is fortuitous, that is limited to indemnification, and that covers an insurable interest. Fortuitous loss means that the loss must be accidental. Indemnification means the insurer not paying more than the actual loss suffered by the insured.  And an insurable interest is one in which the insured may suffer financial loss due to the occurrence of a fortuitous event.

Angelina also credibly explained that there are four "ables" characteristic of insurable risk, though few risks satisfy all four. Insurable risks are poolable, determinable, calculable, and manageable. Poolable means the risk entails a sufficiently large number of independent exposure units in order to make the risk of loss to the insurance company reasonably predictable.  Determinable means the loss must be of a finite nature that is clearly defined by the insurance policy so that the amount indemnified is actually known and capable of measurement.  Calculable means the risk is of a nature such that the insurer is able to estimate an appropriate premium based on the expected frequency and severity of the loss arising from the exposure. And manageable means that the risk can't be catastrophic in nature, while taking into account risk-management techniques such as risk diversification and reinsurance.

Angelina also explained the necessary risk shifting and distribution involved in an insurance transaction.  Risk shifting transfers the financial uncertainty of an adverse event to a third party in exchange for what is normally a fixed dollar amount.  Risk

**[*22]** distribution is based on the law of large numbers. He explained that "according to the Law of Large Numbers, the greater the number of independent exposures, the more closely the actual results will approach the probable results that are expected." One does not have to have sufficient risk distribution for each policy; instead, the industry views risk distribution from the perspective of the entire package of policies that an insurer writes for an insured. This can be true even if the risks being insured are correlated because these risks can be exposed to different forms of loss. By way of analogy, if one doesn't have enough apples or enough oranges to insure, one may still have enough fruit.

VII.  *Calculating CFM's Premiums*

As we explained in *Avrahami*, 149 T.C. at 151–52, the underwriting process determines the terms, conditions, price, and acceptability of risk that an insurance company will take on in a competitive market.  The goal of an insurer is to price the policy high enough so that the premiums cover the expected losses and operational expenses while providing for a profit. *Id.* at 152. The job of calculating premiums is divided between actuaries and underwriters. *Id.* Actuaries "define the rating scheme," while underwriters adjust for the given risks through their individual selections of relevant factors.  *Id.*

An actuary typically determines the rating system by starting with published rates and large datasets for particular risks and making adjustments to various factors including "policy limits, estimates of the frequency and severity of loss, deductibles, the claims history of a particular customer, and perhaps a dozen or so other factors that can be combined into equations that he uses to set a premium for a particular policy." *Id.* An actuary is supposed to make sure that his work is appropriate for its intended use, consider whether his work includes large enough risk statistics, and check the reasonableness of his results. Actuarial Standard of Practice No. 12: Risk Classification (for All Practice Areas) § 3.3 (Actuarial Standards Bd. 2005).[26]

To determine the coverage and in turn the premiums of each policy, Inman—Artex's director of underwriting—used a rating system

---

[26] "The Actuarial Standards Board (ASB) is vested by the professional actuarial societies with the responsibility for promulgating Actuarial Standards of Practice (ASOPs) for actuaries providing professional services in the United States. Actuaries are required to follow the ASOPs by their actuarial societies." *Avrahami*, 149 T.C. at 152 n.9 (quoting *Acuity, A Mut. Ins. Co., & Subs. v. Commissioner*, T.C. Memo. 2013-209, at *13).

[*23] set up by an outside actuary. This rating system consisted of an exposure measure as well as various captive-risk measures.

Inman and her team made adjustments to the base rates to account for the particulars of the insured entities through selecting the appropriate values to plug into the equation. A risk factor below 1 lowered the premium, while a risk factor greater than 1 increased it. The equation along with the factors used in the equation are as follows:

$$Premium = \frac{Revenue}{1,000} \times R \times LCM \times SV \times FR \times L \times \text{AdjPercl} \times CFRTotal$$

| Abbreviation | Factor | Explanation |
|---|---|---|
| R | Rate | This was also known as a "loss factor;" it was a base rate that was given to each different type of policy. This was an output from a simulation that was run. |
| LCM | Loss Cost Multiplier | A factor for what the limit is going to be. One wants something to put in if there's going to be a deductible. |
| SV | Severity | Expected severity of claims under the policy. |
| FR | Frequency | Expected frequency of claims for the policy. |
| L | IncLimits | Factor associated with the policy limit. |
| AdjPercl | Adequacy of Assets | How adequate the assets are in the captive to pay the claim. |
| CRFTotal | Captive Risk Factor Total | The riskiness of the insured company itself. |

While Inman did not describe the reasoning behind the policy-specific risk factors in her testimony, she outlined how she determined the CRFTotal for each of the years. This figure gives the individual insured a risk grade factor that is plugged into the equation.

| Solvency of the captive | Inman testified that the adequacy of the assets in the captive were set at 1.25 for 2012 and 2013 because for the first year, it only had its base capital when it started and one is not supposed to pay claims out of its base capital, one is supposed to keep it. Artex felt that it needed to have higher premiums to get some assets in the captive. After the second year it went to 1 because CFM had more assets from the premiums paid in the first two years. |
|---|---|

| [*24] Claims history of the insured | The more claims submitted, the higher this number would be. For the first two years, Inman set this as 1 since there was no claims history. As no claims were submitted in the first two years, the number lowered to 0.7. |
|---|---|
| Limits on the policy | Inman testified that it was a multiplier, and a factor used to calculate the risk factor for the size of the client's revenue. It was used for 2012 and 2013, but for 2014 and beyond was removed from the calculation. She had no explanation for how she arrived at the numbers for the first two years. |
| Size of the insured | Size of the insured was a factor used to indicate the impact that massive growth of a company had on their risk. Again, there was no explanation of how this was determined for Caputo's. |
| Whether the business was family run | Artex used this factor in the first two years, and it was supposed to show whether a family-run business affected the risk. Inman testified, however, that since nearly all captives insure family-run businesses this factor did not make much sense as it would almost always be neutral. |
| Length of time in business and how seasoned was the management | Inman described this as a risk factor that reflected how seasoned management was, and how long it had been in business. The longer a business had been around, the less risk it had. |
| Number of products sold in the business | Inman testified that since Caputo's had eight or nine stores, and each store had quite a number of products including their own, this factor showed lower risk. |
| The type of regulatory environment for the insured | A subjective factor to reflect the type of regulatory environment for the insured. |
| Geographic Spread of Risk | The higher the geographical spread, the lower this factor. |

Not all factors were present in all years. From 2012 to 2015, actuary Julie Ekdom worked with Inman to change the factors used in the Artex model,[27] including the rate-loss cost multiplier, expense-loss, increased-limits factor, deductible, and schedule-modification

---

[27] The Commissioner points out that for 2012, 7 of the 10 policies that were written by CFM were different from the calculations resulting from the equation Inman testified to. We think it is more likely than not that the difference in calculations was a result of the shifts that took place while Ekdom and Inman were updating their actuarial method as Inman also testified that policy premiums were determined outside this model.

**[*25]** factors.[28]    There were also several policies for which Artex determined premiums outside this rating system.[29]

| Policy | Years Determined Outside Rating System |
|---|---|
| Collection Risk | 2012, 2013 |
| Employment Practices Liability | 2012, 2013, 2014, 2015 |
| Mechanical Breakdown DR | 2015 |
| Property DR | 2015 |

VIII.  *How Things Went*

Caputo's New Farm submitted no claims for 2012 or 2013 and only two for 2014.  One of these, originally filed under the regulatory-change policy, was an almost $1 million claim for updating the company's network infrastructure to ensure it was in compliance with Payment Card Industry (PCI) requirements.  After Leavitt told Caputo's New Farm that the claim wasn't covered under that policy, Caputo's New Farm resubmitted it under the business interruption DIC policy, and argued that this cost was a response to a cyberattack.  Artex then approved the claim.

Caputo's New Farm submitted only one other claim in 2014 and three more in 2015.  Artex handled them in a somewhat unusual way.  Some of them were paid before Caputo's New Farm submitted a notice-of-claim form.  And some were paid before CFM authorized payment.

---

[28] Ekdom prepared a written actuarial review of the property and liability rating methodology of provincial insurance which she finished in February 2014.  The review memorialized the changes made to Artex's rating model.

[29] When the network security and privacy policy was added in 2014 Gabinski got a quote from a commercial carrier which he provided to Inman.  Inman used the premiums for the commercial coverage to determine if the premiums she determined were reasonable.  She also considered the fact that the commercial policy had a self-insured retention, which the insured had to pay before the policy would start paying and CFM's captive policy did not.

**[\*26]** IX.   *The Returns*

    A.    *CFM's Returns*

For the 2012 tax year, CFM elected to be treated as a small insurance company under section 831(b).[30]  It did not withdraw that election for any of the years before us.  The insurance premiums that CFM collected in 2012–15 never exceeded $1.2 million:

| Year | Total Premiums |
|------|----------------|
| 2012 | $1,199,136 |
| 2013 | 1,199,136 |
| 2014 | 1,196,148 |
| 2015 | 1,199,023 |

    B.    *The Prestas' Returns*

The Prestas timely filed their returns for 2012–15.  The Caputo's entities deducted the insurance premiums paid to CFM.  The captive-insurance premiums had been allocated to the various Caputo's entities according to their income and so were the deductions.  While there were no claims filed in the first two years, the Caputo's entities included in their income the five claims made in 2014 and 2015 that were paid.  The allocations for each year were as follows:

---

[30] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[*27]** 2012 Allocations:

| Entity | Gross Income | Captive Insurance Premiums Deducted |
|---|---|---|
| Elmwood Park Store | $33,174,993 | $275,801 |
| Addison Store | 21,657,954 | 179,870 |
| Bloomingdale Store | 17,857,290 | 143,896 |
| Hanover Park Store | 19,907,138 | 167,879 |
| Naperville Store | 31,062,156 | 263,810 |
| South Elgin Store | 19,108,458 | 167,878 |
| LBR Importing & Distributing | 1,040,370 | — |
| **Total** | **$143,808,359** | **$1,199,134** |

2013 Allocations:

| Entity | Gross Income | Captive Insurance Premiums Deducted |
|---|---|---|
| Elmwood Park Store | $32,366,618 | $287,793 |
| Addison Store | 20,172,869 | 167,879 |
| Bloomingdale Store | 17,570,081 | 155,888 |
| Hanover Park Store | 18,461,711 | 167,879 |
| Naperville Store | 29,331,714 | 251,819 |
| South Elgin Store | 19,405,186 | 167,878 |
| LBR Importing & Distributing | 434,806 | — |
| **Total** | **$137,742,985** | **$1,199,136** |

**[\*28]** 2014 Allocations:

| Entity | Gross Income | Captive Insurance Premiums Deducted | Other Claim Reimbursed by CFM | Net (Reduction of) or Addition to Taxable Income |
|---|---|---|---|---|
| Elmwood Park Store | $31,414,166 | $255,429 | $142,000 | ($113,429) |
| Addison Store | 18,490,825 | 150,297 | 129,000 | (21,297) |
| Bloomingdale Store | 17,405,958 | 140,735 | 112,000 | (28,735) |
| Hanover Park Store | 16,611,415 | 135,211 | 118,000 | (17,211) |
| Naperville Store | 29,080,235 | 236,871 | 145,000 | (91,871) |
| South Elgin Store | 19,714,996 | 159,816 | 124,000 | (35,816) |
| Carol Stream Store | 6,577,707 | 45,451 | 39,000 | (6,451) |
| Downers Grove Store | 9,847,266 | 72,338 | 96,000 | 23,662 |
| LBR Importing & Distributing | 1,576,938 | — | 95,000 | 95,000 |
| **Total** | **$150,719,506** | **$1,196,148** | **$1,000,000** | **($196,148)** |

2015 Allocations:

| Entity | Gross Income | Captive Insurance Premiums Deducted | Other Income From Claim Reimbursement by CFM | Net (Reduction of) or Addition to Taxable Income. |
|---|---|---|---|---|
| Elmwood Park Store | $28,556,105 | $215,824 | — | ($215,824) |
| Addison Store | 17,088,891 | 131,893 | — | (131,893) |
| Bloomingdale Store | 16,558,996 | 119,902 | — | (119,902) |
| Hanover Park Store | 15,340,815 | 107,912 | — | (107,912) |

| [*29]<br><br>Entity | Gross Income | Captive Insurance Premiums Deducted | Other Income From Claim Reimbursement by CFM | Net (Reduction of) or Addition to Taxable Income. |
|---|---|---|---|---|
| Naperville Store | 27,401,234 | 203,883 | 17,150 | (186,733) |
| South Elgin Store | 19,557,413 | 143,883 | — | (143,883) |
| Carol Stream Store | 19,511,488 | 143,883 | — | (143,883) |
| Downers Grove Store | 17,316,746 | 131,893 | — | (131,893) |
| LBR Importing & Distributing | 881,009 | — | 15,459 | 15,459 |
| **Total** | **$162,212,697** | **$1,199,073** | **$32,609** | **($1,166,464)** |

Since all of these were passthrough entities, the deductions passed through to the Prestas. This meant the less income the entity received, the less passthrough income the Prestas were obligated to report on their returns. For 2012, 2013, and 2015, the Prestas reported the following passthrough income on their returns.[31]

| Year | Passthrough Income |
|---|---|
| 2012 | $5,737,662 |
| 2013 | 1,616,703 |
| 2015 | −1,458,537 |

In 2016, the Prestas filed a Form 1040X, Amended U.S. Individual Income Tax Return, to amend their 2012 return in order to carry back a claimed net operating loss (NOL) from taxable year 2014. The 2012 Form 1040X claimed a refund of $480,371 which was refunded March 2016.[32]

---

[31] The Commissioner did not determine a deficiency for the Prestas' 2014 return.

[32] The Prestas also submitted a Form 1040X in December 2016 to amend their 2013 return; however, the Commissioner denied the claimed refund on the basis that the Prestas were not allowed to deduct the captive-insurance premiums they had paid in 2015.

**[\*30]** X.     *Audit, Petitions, and Trial*

In April 2019 the Commissioner sent notices of deficiency to CFM for its 2012, 2013, 2014, and 2015 tax years and to the Prestas for their 2012, 2013, and 2015 tax years. CFM and the Prestas were not alone—the Commissioner had noticed a boom in microcaptive insurance transactions.[33]  *See* I.R.S. Notice 2016-66, 2016-47 I.R.B. 745; I.R.S. News Release IR-2015-19 (Feb. 3, 2015).

The Commissioner disallowed CFM's section 831(b) election because the premium income was paid as part of a transaction that was "not [an] insurance transactio[n] within the meaning of federal tax law." He also asserted that CFM was liable for tax on insurance income under section 61.[34]

The Commissioner disallowed the Prestas' passthrough insurance deduction for 2012, 2013, and 2015 from the Caputo's entities because the payments to CFM were not insurance premiums and therefore were not deductible.

The Commissioner also disallowed the nearly $1.2 million NOL deduction for 2012 to the extent it was attributable to deductions for captive insurance for 2014. He then imposed accuracy-related penalties for all three years.[35]

CFM and the Prestas timely petitioned our Court. We tried the case in Chicago; the Prestas were residents of Illinois when they filed the petition and therefore the presumptive venue for any appeal in their case appears to lie in the Seventh Circuit. *See* § 7482(b)(1)(A). CFM did not have a principal place of business or office when it filed its petition, as well as when it e-filed its returns.  Therefore, venue for any

---

[33] As we noted in *Avrahami*, 149 T.C. at 173, the IRS began applying increased scrutiny to microcaptive transactions beginning in 2015.

[34] The notice of deficiency states that CFM was not "eligible for tax treatment under section 831(b). The amounts that [they] were entitled to, and/or received, under a purported captive insurance program [were] includible in [their] gross income under section 61." The Commissioner also asserted, but later conceded accuracy-related penalties for the years at issue.

[35] The Commissioner concedes the 40% rate enhancement under section 6662(i) that he initially determined in the notice of deficiency. The Commissioner had also determined penalties under section 6662(b)(6) for a transaction lacking economic substance, but we have already held that the Commissioner did not comply with section 6751(b)(1) for that penalty.

**[\*31]** appeal of its case presumptively lies in the D.C. Circuit. *See* § 7482(b)(1).

## OPINION

Insurance companies, other than life-insurance companies, are generally taxed on their income in the same manner as other corporations. *See* §§ 832, 831(a). This means that an insurance company includes in its taxable income the insurance premiums that it receives. But there is a carveout for insurance companies with premiums that don't exceed $1.2 million for the year. These companies can elect to be taxed under section 831(b), which excludes premiums from their taxable income. § 831(b)(1) and (2).

There are also benefits for businesses that buy insurance—amounts that a business sets aside in a loss reserve as a form of self-insurance are not deductible. *Harper Grp. v. Commissioner*, 96 T.C. 45, 46 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992). But insurance premiums are deductible as ordinary and necessary business expenses under section 162(a). Treas. Reg. § 1.162-1(a).

Despite these laws governing the tax treatment of insurance premiums for both insurance companies and businesses paying premiums, neither the Code nor the regulations tell us what counts as "insurance". *Avrahami*, 149 T.C. at 174 (citing *Securitas*, 108 T.C.M. (CCH) 490). For that we need to go to the caselaw. In *Helvering v. Le Gierse*, 312 U.S. at 539, the Supreme Court stated that insurance involves "an actual 'insurance risk'" and that "[h]istorically and commonly insurance involves risk-shifting and risk-distributing."

Drawing the distinction between what counts as insurance and what doesn't can get a bit tricky when the insurer and the insured are related since the line between actual insurance and self-insurance begins to blur. *Avrahami*, 149 T.C. at 176. As we explained in *Avrahami*, a "pure captive insurance company is one that insures only the risks of companies related to it by ownership." *Id.* As captive insurance became more popular, the IRS challenged whether payments between companies and their captives were deductible insurance expenses. *Id.* at 177 (citing Rev. Rul. 77-316, 1977-2 C.B. 53).

Captive insurance for large corporations became widely accepted. *See, e.g.*, *AMERCO & Subs. v. Commissioner*, 96 T.C. 18, 42 (1991), *aff'd*, 979 F.2d 162 (9th Cir. 1992); *Harper Grp.*, 96 T.C. at 60; *Rent-A-Center*, 142 T.C. at 24.

**[*32]** The grafting of captive insurance onto the benefits afforded small insurance companies under section 831 produced microcaptive insurance. As we noted in *Avrahami*, it is possible that one of these microcaptives could operate legitimately—just as captive insurance companies can operate legitimately. *See Avrahami*, 149 T.C. at 179. But, as we've found on numerous occasions, when a microcaptive-insurance company generates insurance premium deductions but doesn't actually provide insurance, the tax advantages of the transaction fall apart. *See generally id.*; *Patel*, T.C. Memo. 2024-34; *Swift*, T.C. Memo. 2024-13; *Keating*, T.C. Memo. 2024-2; *Caylor*, 121 T.C.M. (CCH) at 1217–18; *Syzygy*, 117 T.C.M. (CCH) at 1176; *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1489–90.

## I.    *The Parties' Arguments*

The Commissioner argues that CFM is just another illegitimate microcaptive. The Prestas argue that these cases are distinct from the others and present us with new arguments we have not yet considered. They first argue that under federal law Utah gets to decide whether CFM qualifies as an insurance company within the meaning of section 831. Since Utah has unequivocally deemed CFM an insurance company, they argue that should be the end of our inquiry. Even if we reject this argument, the Prestas claim, CFM still qualifies as an insurance company under the common-law definition.

If all else fails, they argue that we should unwind the entire construction of CFM and treat the money paid to CFM as either a contribution of capital or deposits to a loss reserve. Though the Caputo's entities would not be entitled to the deductions they took for the payment of insurance premiums, CFM would not be liable for tax on those payments. And if we characterize CFM as a loss reserve, the Prestas argue that they would also be entitled to an adjustment to reimbursement for the insurance payouts that the Caputo's entities reported as taxable income in previous years and that flowed through to them.[36]

## II.    *McCarran-Ferguson Act*

The Prestas begin by arguing that it is not up to the Commissioner or our Court to decide what does and does not count as

---

[36] The Prestas argue that CFM is entitled to deduct the expenses that resulted from processing the claims. They failed, however, to provide any evidence of the amount that CFM would be entitled to deduct.

**[\*33]** insurance. They claim instead that this choice is one Congress explicitly left to the states in the McCarran-Ferguson Act (Act). The Act provides:

> 15 U.S.C. § 1012. Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948
>
> (a) State regulation—
>
> The *business of insurance*, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> (b) Federal regulation—
>
> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .

(Emphasis added.)

This is a new argument. CFM is a domestic company, and most of the microcaptive cases we've seen so far have featured insurance companies operated and regulated offshore. *See Avrahami*, 149 T.C. at 149 (insurer incorporated in St. Kitts); *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1475 (Anguilla); *Caylor*, 121 T.C.M. (CCH) at 1208 (Anguilla); *Rent-A-Center*, 142 T.C. at 4 (Bermuda). *But see Securitas*, 108 T.C.M. (CCH) 490 (Ireland and Vermont); *Syzygy*, 117 T.C.M. (CCH) 1165 (insurer incorporated in Delaware); *Jones*, T.C. Memo. 2025-25 (insurer incorporated in Montana).

CFM was incorporated in and regulated by Utah. The Prestas argue that Title 31A of the Utah Code regulates the business of insurance. The Utah Insurance Department has determined CFM is a valid insurance company, and continues to examine it periodically to ensure that it remains an insurance company in good standing under state law. That means, in CFM's view, that Utah has regulated CFM and found it be an "insurance" company. CFM then asserts that there is no Code section or regulation that defines what "insurance" is, and so when federal courts define "insurance" in the common-law fashion of explaining the concept in a case-by-case evolution, we are not properly deferring to state legislators and regulators who have already done so. In the case of Utah, both legislators and regulators have defined "captive insurance" and pronounced CFM to have to be selling a legal form of it.

**[\*34]** If we were to find that what CFM provided was not "insurance" that would mean we'd be finding CFM was not an "insurance company," and that finding *would* crash into the McCarran-Ferguson Act's prohibition.

This may be a novel argument, but we don't think it a persuasive one. The Act's prohibition is not against recharacterizing what a state may call "insurance". The prohibition is against construing the Code to "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating *the business of insurance.*" 15 U.S.C. § 1012(b) (emphasis added).

There is a distinction between "insurance" and "the business of insurance." As the Supreme Court has explained:

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' . . . [W]hatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder.

*SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 460 (1969).

In these cases, nothing we do in interpreting and applying the Code in any way regulates the relationship between CFM and Caputo's Fresh Market. We can leave that to Utah.

There is also another problem here for CFM, because the prohibition is not on federal regulation of the "business of insurance," it's on invalidating, impairing, or superseding state law "for the purpose of regulating the business of insurance." *See id.* at 457. Section 831 imposes tax consequences on particular transactions. The congressional choice of taxing or not taxing a transaction is not (within perhaps very broad limits that might amount, for example, to taxation so high as to be destructive) invalidating, impairing, or superseding state law. Again, as the Supreme Court has held, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Humana Inc. v. Forsyth*, 525 U.S. 299, 301 (1999).

**[*35]** Just so here. We may conclude that the Prestas don't get deductions for the premiums Caputo's New Farm paid CFM; we may decide that CFM doesn't get to exclude the money it got from Caputo's New Farm from its taxable income. This would undoubtedly reduce the attractiveness of microcaptive insurance. But it would not invalidate or impair or supersede Utah law, any more than making the purchase of life insurance a nondeductible personal expense in most cases impairs any of the state laws regulating that part of the insurance business. *See, e.g., AMERCO*, 96 T.C. at 42; *Patel*, T.C. Memo. 2024-34, at *51 n.21. We therefore hold that the Act does not require us to defer to the Utah Insurance Department regulators' determination that CFM is an insurance company.

III.   *Whether This Was Insurance*

We can now turn to the familiar question of whether what CFM provided Caputo's New Farm was insurance under federal tax law. Was it a transaction that

- shifted risk;

- distributed risk;

- involved insurance risk; and

- met the commonly accepted notion of insurance?

*See Avrahami*, 149 T.C. at 177.

The Commissioner concedes that the transactions satisfy the insurable-risk and risk-shifting parts of this test, so we need to decide only whether CFM's policies distributed risk and met the commonly accepted notion of insurance.

A.   *Risk Distribution*

Risk distribution is one of the essential characteristics of insurance that the Supreme Court identified in *Helvering v. Le Gierse*, 312 U.S. at 539. Courts will find sufficient risk distribution when a company pools a large enough collection of unrelated risks. *Rent-A-Center*, 142 T.C. at 24. The rule is rooted in the law of large numbers— "a statistical concept that theorizes that the average of a large number of independent losses will be close to the expected loss." *Patel*, T.C. Memo. 2024-34, at *38 (quoting *Avrahami*, 149 T.C. at 181). In other

**[*36]** words, "[b]y assuming numerous relatively small, independent risks that occur randomly over time, the insurer smooths out losses to match more closely its receipt of premiums." *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1300 (9th Cir. 1987), *aff'g* 84 T.C. 948 (1985).

In the first three microcaptive-insurance cases we saw, the insurers attempted to satisfy this requirement by engaging in "insurance pools." An insurance pool is "a way to reinsure a large number of geographically diverse third parties." *Caylor*, 121 T.C.M. (CCH) at 1213 (citing *Avrahami*, 149 T.C. at 163). In each case, we found that insurance pools alone were not sufficient to satisfy the risk-distribution requirement for insurance. *See id.*

Microcaptives have also tried to show that they met the risk-distribution requirement by issuing policies to their own brother and sister entities. *Id.* The key question then became whether there was a large enough pool of unrelated risk. *Id.* The answer to this question does not hinge solely on "the number of brother-sister entities insured, but [on] the number of *independent* risk exposures." *Id.* (emphasis added). In all our previous microcaptive cases, we came to the same conclusion—there wasn't a large enough pool of unrelated risk for the policies issued to the related entities to satisfy the law of large numbers. *Id.* at 1213–14; *see also Avrahami*, 149 T.C. at 181–82 (seven types of policies to four entities insufficient); *Syzygy*, 117 T.C.M. (CCH) at 1169 (eight policies to one entity insufficient); *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1479–80 (eleven to thirteen policies for three 3 entities insufficient).

*Caylor* was the first case where we saw a microcaptive-insurance company that did not engage in pooling. *Caylor*, 121 T.C.M. (CCH) at 1213. In that case, we examined the independent risk exposures that arose from issuing policies to brother-sister entities. *Id.* at 1214. We looked at seven different policies and found that the maximum independent exposures from each policy ranged from 1 to 12. *Id.* We compared this with the risk exposures that we found sufficient in large-captive cases. *Id.*

**[\*37]**

- In *Harper Group*, we found that 7,500 customers, 30,000 different shipments, and 6,722 special cargo policies were sufficient. *Id.* (citing *Harper Grp.*, 96 T.C. at 51).[37]

- In *Rent-A-Center* the captive insured 3 types of risks, 14,000 employees, 7,000 vehicles, and 2,600 stores; we found it to have sufficient exposure units. *Id.* (citing *Rent-A-Center*, 142 T.C. at 2).

- In *R.V.I. Guaranty*, the insurance company insured one type of risk but issued 951 policies to 714 different insured parties and their 754,000 passenger vehicles, over 2,000 real-estate properties, and 1.3 million commercial equipment assets. *R.V.I. Guar. Co. v. Commissioner*, 145 T.C. 209, 214 (2015).

As we stated in *Caylor*, "[t]here is no precise number of independent risks that must exist for risk to be sufficiently distributed to meet this element—we're not a legislature or regulator, and that's not the way common-law concepts become clearer over time." 121 T.C.M. (CCH) at 1214. In that case, however, we found that the number of independent risks that the insured faced were "at least a couple orders of magnitude smaller than the captives in cases where we've found sufficient distribution of risk." *Id.*

### 1. *Safe Harbor*

There is no bright line rule for what constitutes sufficient risk exposures, but there may be a safe harbor. The Commissioner conceded in Revenue Ruling 2002-90, 2002-52 I.R.B. 985, that risk distribution may be adequate if a captive insurer insures the risk of 12 or more related entities all of which have liability coverage between 5% and 15% of the total risk insured. *See Rauenhorst v. Commissioner*, 119 T.C. 157, 171 (2002) (treating as concessions in litigation relevant positions taken by the Commissioner in revenue rulings).[38]

---

[37] For perspective, this meant that more than 260,000 air shipments, 18,000 air flights, and 40,000 shipments on more than 3,000 ocean voyages were covered. *Harper Grp.*, 96 T.C. at 51.

[38] The Commissioner himself describes the revenue ruling in his brief as finding adequate risk distribution with "12 brother-sister entities, none of which represented more than 15% of the total risk insured."

**[*38]** Though Caputo's entities have sufficient numbers to satisfy the number of related entities that the Commissioner described in the revenue ruling,[39] the Prestas made no arguments and presented no evidence that none of the entities represented more than 15 percent of the total risk insured. Because of this, we cannot find them to have docked in this safe harbor.

### 2. *Independent Risk Exposures*

We turn to the question of whether the number of CFM's independent risk exposures was large enough to satisfy the law of large numbers. This requires us to first determine (1) how many risk exposures existed and (2) whether those risk exposures were sufficiently independent.

### a. *Exposure Units*

The Commissioner claims that the Prestas' failure to connect the specific risk exposures to specific policies is detrimental to their case. He argues this failure makes it impossible to determine which, if any, of the policies satisfies the risk-distribution requirement. The problem for the Commissioner here—and indeed for almost all his positions about risk distribution in these cases—is that it was unsupported by his own experts. Professor Angelina testified on behalf of the Prestas that an insurance company does not need risk distribution for every single policy to satisfy risk distribution as a whole. It needs only risk distribution from the collection of policies that it issues. One of the Commissioner's experts, Mark Meyer, likewise testified that the law of large numbers "not only refers to the number of individual initiating events, but again, the policies and the procedures and the like."

The Commissioner's main expert, Roberta Garland, conceded that the only way risk distribution could be achieved with these types of policies is by combining the risks with other policies. Garland began her testimony with a conclusion—that in her opinion CFM did not provide enough risk distribution. She articulated that she would look, not at the number of risk exposures but at the number of claims made. If the volume of claims were small, she said she would look for "tens of millions of dollars of premium paid." When asked about the specific policies that CFM issued, she couldn't answer even with a range of how many

---

[39] The Commissioner argues that we should disregard some of the entities insured by CFM. As we discuss *infra* Part III.A.2.b, we do not agree.

**[\*39]** exposures would suffice to trigger the law of large numbers. But then she conceded that a captive manager like Tribeca/Artex could accumulate through its own experience enough data for the law of large numbers to apply.

It went much worse for the Commissioner with his other expert, Meyer. In his report he also testified that there was inadequate risk distribution in CFM. But on cross-examination he admitted that that was a conclusion without supporting analysis. He then proceeded to go through many of the policies at issue in these cases and agree with the Prestas:

- 50,000 different products "could be" separate risk events;

- 3–4 million customer visits "would certainly figure into the risk distribution analysis for the commercial insurance;"

- every pizza sold could carry a risk of food poisoning, and "they sell a lot of pizzas" so the law of large numbers would "probably" kick in;

- in discussing the regulatory-change policy, he conceded that "the government could do an infinite number of regulatory changes, and there are multiple levels of government."

The transcript goes on like this for page after page. The Prestas' counsel summed it up: "I don't see here . . . where you analyze the number of exposure units under the policies that are at issue in this case. Is that a fair statement?" "Correct."

Consistent with the experts who testified, we look to see whether there is sufficient risk across all of the policies CFM issued to determine whether this risk-distribution requirement is satisfied: "The legal requirement for 'insurance' is that there be meaningful risk distribution; perfect independence of risks is not required." *See R.V.I. Guar.*, 145 T.C. at 230 (citing *Rent-A-Center*, 142 T.C. at 24). We will therefore look to see whether there are sufficient risk exposures across all of the policies issued to determine whether, collectively, they satisfy the law of large numbers on the record we have before us.

i.        *Customer Transactions*

We begin with the fundamental question of what counts as a risk exposure? The Prestas learned from our earlier cases that counting each

**[\*40]** business, or each business location, would probably not work for them. So they put on display in these cases a much broader definition of risk exposure and supported it not only with their own experts' testimony but with the testimony on cross-examination of the Commissioner's own experts.

They first posited that each consumer transaction in each of the Caputo's stores was a unique risk exposure. That gets the numbers up— the average number of customer transactions during the years at issue was around 4.5 million in all of the Caputo's stores. The Commissioner did not object. Angelina and Meyer, as well as Garland, all testified that for certain policies, the number of customers is an appropriate exposure unit.[40] As the Prestas highlight in their brief, the number of customer transactions is substantially lower than the number of actual customers who frequent the store, because paying customers routinely shop with friends and family even if they buy only one item, or even none at all. This makes the number of customer transactions actually lower than the exposure unit that all of the experts, including the Commissioner's, testified would be an appropriate measure of risk exposure.

The Commissioner resists using customer transactions as the unit of risk, and argues that this would misdirect our analysis from the insurer to the insured. He reminds us that "[i]n analyzing risk distribution, we look at the actions of the insurer because it is the insurer's, not the insured's, risk that is reduced by risk distribution." *Rent-A-Center*, 142 T.C. at 24 (citing *Harper Grp.*, 96 T.C. at 57). The Commissioner points out how in *Rent-A-Center*, the insurer's risk distribution was determined by the number of vehicles insured because "no matter the number of drivers, there is only one vehicle that can cause damage or be damaged." *See* Resp't Seriatim Answering Br. 384, No. 170.

We would have to discount the testimony given by all of the experts and adopt the Commissioner's extrapolation on brief from *Rent-A-Center* to reach a similar result here. Like the cars driven by customers that counted as exposure units, it appears on the unusual record before us as the parties created it in these cases that each individual item purchased by a customer is a similarly appropriate exposure unit. This figure would far outstrip the average 4.5 million

---

[40] Professor Angelina opined that CFM achieved adequate risk distribution. Meyer agreed that the "law of large numbers was present in the General Liability DIC, Legal/Litigation Expense, Mechanical Breakdown-DIC, and Product Recall policies."

[*41] transactions that took place at the Caputo's stores in each year—we take judicial notice that a typical trip to the grocery store typically results in a customer's leaving with more than just one item.

The Commissioner's experts, as well as the logic of the Commissioner's own argument, lead us to find on these facts that customer transactions themselves may not be an appropriate exposure unit, but they can serve as a proxy to set a floor for how many customers shopped at the store.

### ii. *Products Sold*

There were more than 50,000 different products sold at Caputo's stores. Meyer and Garland testified that products sold was an appropriate exposure unit for at least one of the policies at issue. The Commissioner doesn't argue that products sold is an insufficient exposure unit, but posits that 50,000 is an inflated figure. Most of the products sold by the Caputo's stores were manufactured and distributed by third parties who themselves carried the risk of a product recall. The Commissioner claims that because the third parties were responsible for product recalls, there was no risk that Caputo's had in carrying these products. With no risk, they should not be considered exposure units.

We disagree. Just because a product was covered by a third party for recall does not mean that the storage and handling of that product didn't pose a risk to Caputo's. If a recall did take place, Caputo's would bear the cost of recalling products even if they were purchased from a vendor and the stores' commercial general liability policies would not otherwise cover the expense. Based on these facts we find that the 50,000 different product types sold at the Caputo's stores are risk exposures.

### iii. *Major Equipment*

The Prestas reported that they had 2,000 pieces of major equipment that each created an independent risk. They defined major equipment as anything mechanical or worth more than $5,000. The Commissioner does not contest that major equipment is an adequate exposure unit. He instead contests the sufficiency of the Prestas' proof of the number of pieces of major equipment.

The Commissioner correctly points out that the only evidence we have that there were roughly 2,000 pieces of major equipment was from Robertino Presta's testimony. We have the depreciation schedules from

[*42] Carol Stream and Downers Grove, but the assets listed aren't itemized. The Prestas concede that the list groups assets together and does not list them individually. The books and records contain depreciation schedule of LBR Importing. According to those, there were 475 tangible depreciable assets in 2012 and 2013 and around 700 in 2014 and 2015. These figures include both mechanical and nonmechanical assets and there is nothing in the record to distinguish them.

Based on these facts, we agree with the Commissioner on this point. Though major equipment created some number of increased risk exposures, we don't have enough in the record to corroborate Presta's testimony that the number of pieces of equipment was 2,000.

### iv. *Computer Logins*

There were 1,300–1,500 computer logins. The Prestas claim that each login posed a unique risk exposure. The Commissioner again argues that this is an inappropriate exposure unit.

There is no expert testimony to indicate that this would have been an independent risk exposure for any of the policies. It is possible that this could have been an exposure unit taken into consideration to determine risk distribution for the cyber-risk policy. Angelina testified that the proper metric for a cyber-risk policy would be either the number of servers or the revenue of the company. The Prestas didn't give us a good reason to count the number of logins as risk exposures. We agree with the Commissioner here.

### v. *Employees*

There were between 1,023–2,183 employees during the years at issue. The Prestas claim that each employee is a risk exposure. The Commissioner made no compelling arguments to refute this.

### vi. *Key Employees*

The Prestas claim that there were 90 key employees that should each be considered an independent risk exposure. The Commissioner does not contest that key employees is an appropriate risk unit, but says that CFM failed to prove how many—if any—key employees existed.

The only evidence we have of key employees is Robertino Presta's testimony at trial and a list of 90 key employes sourced from an email

**[\*43]** sent in 2022, which was two months before trial. The email does not provide the period of employment, job title, or duties of any of the individuals named. Because of these omissions, the list is insufficient for us to conclude that it represents an adequate number of key employees.

We agree with the Commissioner that the Prestas failed to prove how many, if any, key employees they had during the years at issue.

### vii. *Regulatory Changes*

For this category, the Prestas ask us to somehow calculate "unlimited" into the number of risk exposure units. They cite Meyer's testimony that there are an "infinite number of regulatory changes." Though this may be true, we cannot find that the unlimited reach of the regulatory state can be used as an exposure unit. Angelina testified that to determine the exposure units for a regulatory-change policy, one looks at revenue. We find this more plausible and therefore reject the Prestas' attempt to inflate their exposure units to unlimited.

### viii. *Store Location*

Caputo's had between six and eight store locations during the years at issue. The Commissioner concedes "each posed a risk to CFM."[41] The Commissioner does not contest that the stores count as exposure units. Instead, he challenges that they are independent risks.

### ix. *Suppliers*

The Prestas claim that Caputo's had 301 suppliers and that each of them was a risk to CFM. The Commissioner does not contest that the number of suppliers is an adequate measure of risk exposure. He claims instead that the number of suppliers was not adequately established by the record.

The Commissioner does concede that for 2012, Robertino Presta's testimony was sufficient to establish that they had one key supplier, Central Grocers. But since the 2013 policy covered only key suppliers who had written agreements in place, the Commissioner says there is no proof Central Grocers—even if it was considered a key supplier— would have been covered. The only evidence of a written agreement we

---

[41] The Commissioner contests that though these may be adequate exposure units, they do not satisfy the qualification of *independent* exposure units.

[*44] have between Caputo's and Central Grocers is an application to use Central Grocers as a primary supplier.

Despite Presta's admitting at trial that he believed he did not have a written agreement in place with Central Grocers, the Prestas urge us to construe the application as a contract. We agree with the Commissioner that an application is not an agreement. Based on the facts we agree with the Commissioner that there was one key supplier for 2012 which counted as a risk exposure, and that there were none in 2013.

x.     *Unrelated Tenants*

The Prestas allege that 91 unrelated tenants were risks to CFM. The Commissioner claims that the record does not identify most of the tenants. He is right on that point. All we have is Robertino Presta's uncorroborated testimony. That is not enough.

xi.     *Insured Entities and Policies*

There were 17 to 19 insured entities that were each a risk to CFM and 11 to 14 captive policies that were each a risk to CFM. The Commissioner does not contest the number of insured entities or captive policies. He claims instead that the exposures were not independent. We find that the number of entities and policies were adequate exposure units.

b.     *Were the Risk Exposures Independent?*

Having identified the number of exposure units, we must now determine whether the exposure units are independent. We must suss out whether any of the exposure units overlap with one another so we don't count them more than once. The Commissioner challenges the exposure units derived from the number of insured entities, the number of store locations, and the number of insured policies as failing to generate *independent* risk exposure.[42]     We don't need perfect

_____

[42] The Commissioner argues only about the related nature of the Caputo's entities and the different policies. He makes no argument as to why each customer transaction, the number of products sold, the number of employees, or the number of suppliers should not be treated as independent, but he claims that somehow the lack of independence between the Caputo's entities undermines the independent nature of all the exposure units. This is not correct. In *Securitas*, we found that "statistically independent risk exposures" do not change simply because "multiple companies merge

[*45] independence of risk because the legal requirement for insurance is meaningful risk distribution. *See Royalty Mgmt. Ins. Co. v. Commissioner*, T.C. Memo. 2024-87, at *26. When looking for whether there is independent risk exposure, we have identified factors such as the reliance on a single entity, the lack of geographic diversity in locations, the relative concentration of the industry, the revenue, and the interaction of the policies. *See Caylor*, 121 T.C.M. (CCH) at 1214; *see also Patel*, T.C. Memo. 2024-34, at *26 (finding a lack of independent exposures where the captives issued a few dozen policies to only 3 entities the taxpayers owned and covered less than 100 employees in the same industry and regional area).

i. *Number of Entities*

The Commissioner argues that we should treat all of the Caputo's stores as one entity since they shared a corporate office, had centralized HR and IT departments, purchased products from the same vendors, and delivered products to the same warehouses. He argues that because of these commonalities, we should discount the corporate structure of each individual entity and treat all of the Caputo's entities as one for the purpose of this test.

He then argues that it would follow that only LBR Importing and LBR Construction, of which Caputo's was the sole customer, would become dependent on Caputo's. Additionally, 1811 Fullerton, 3115 111th, 520 North, and 7200 Harlem were almost entirely dependent on Caputo's, and 510 Lake Mill Plaza received most of its rent from Caputo's. He argues that this means that this cuts against our finding independent risks.

The Commissioner runs into an issue because he never gives an explanation, other than the similarities the Caputo's stores have, as to why we should treat them as a single entity for the purpose of this test. As the Prestas point out, each Caputo's store was set up as a separate legal entity, had a separate location, separate employees, separate infrastructure, separate customers, and separate equipment. The Commissioner provides us with no precedent or legal theory through

---

into one." Instead, we held that "[t]he risks associated with those companies [do] not vanish once they all [fall] under the same umbrella." 108 T.C.M. (CCH) at 496. Even if we found that it was appropriate to consider all of the Caputo's entities as one unit, this would not undercut the number of independent risk exposures that exist whether or not we count the entities as separate.

**[*46]** which we can disregard the independent corporate status of all the Caputo's companies to find that they are all one mega-entity.

We therefore don't see how we can find that all of the Caputo's entities should be considered a single entity.

## ii.    *Geographic Diversity*

As we said in *Caylor*, concentration of geographic location and industry cut against finding independent risk among different entities. *Caylor*, 121 T.C.M. (CCH) at 1214.  The Commissioner highlights how every brother-sister entity that CFM insured existed in a single metropolitan area.

This factor unequivocally supports the Commissioner.  It also influences the weight we give to the separate Caputo's store locations. Because they are all in the same metropolitan area, perhaps there is some overlap in the nature of the risk that each storefront generated. We are willing to find for the Commissioner that geographical concentration cuts against finding independence.

## iii.    *Diversity of Industry*

The Commissioner also attacks industry concentration.  He cites *Caylor*, where we found that in one way or another all of the insureds were involved in the real-estate industry.  *Caylor*, 121 T.C.M. (CCH) at 1214.  The Commissioner says this case is similar because all the Caputo's entities were in or related to the grocery-store industry.

The Commissioner mischaracterizes *Caylor* as stating that when entities can all somehow be connected to an industry, they automatically fail the diversity-of-industry test.  This is not the case.  In *Caylor*, all of the entities were in the primary business of real estate, held stock in companies focused on real estate, or provided funding for companies that engaged in real-estate transactions. *Caylor*, 121 T.C.M. (CCH) at 1214. All necessary steps to the real-estate industry, but again, all siloed to that one industry. *Id.*

We must remember that when we look at whether an industry was concentrated, we do so with an eye to determining whether risk was adequately distributed (i.e., if a single industry collapsed, would all of the related entities fall together?).

[*47] Though all of the Caputo's entities admittedly are in the grocery business and most of the entities are somehow connected to that business, they are not all dependent on that one industry. Since LBR Importing and LBR Construction never engaged in either importing or construction outside of the grocery-store industry, like the financial institution which financed only real-estate ventures in *Caylor*, it seems safe to say that these two entities were primarily focused on the grocery-store industry.

The same cannot be said for the real-estate holding company or any of the real-estate entities. Under *Caylor*, all of these entities would fall within the real-estate industry. Caputo's did not own every building that their stores were in, and some of the real-estate companies did not even rent buildings to Caputo's or the related entities. They were not necessarily dependent on the grocery-store industry to survive. There may have been some overlap, but there was also independent risk that these companies brought.

### iv. *Revenue as a Proxy for Risk*

In *Caylor*, we found it appropriate to use revenue as a proxy for risk when the premiums were calculated using revenue. *See Caylor*, 121 T.C.M. (CCH) at 1214. Here, many of the policies' premiums were computed using revenue, and therefore it is appropriate to use the revenues as a proxy for risk and in turn the determination of the spread of risk. We found that since most of the companies' revenue was dependent on Caylor Construction, it was likely the companies and therefore the risks they faced were not independent. *Id.*

The Commissioner argues that 94–95% of the revenue of the insured entities stemmed from the combination of all the Caputo's stores. And the support entities, like those in *Caylor*, are mostly dependent on all of the Caputo's stores for their revenues. The Commissioner, however, mischaracterizes the analysis we performed in *Caylor*. In that case, we did not combine all the entities we deemed to be sufficiently related, and then determine whether revenue from the other entities was sufficiently related to that conglomerate. *Id.* We instead looked to see whether one company within the family was the linchpin for them all. *Id.*

To reiterate, the Commissioner provides no valid explanation through his experts as to why we should treat all of the Caputo's separate entities as a single entity for the purpose of this test.

**[\*48]** Consequently, the revenues for each of the Caputo's should be looked at separately. If we do so, the other entities' reliance on any single Caputo's store is distributed more evenly. We don't think that the revenues of the companies indicate a lack of independence among the entities.

### v. *Independence of Policies*

In *Caylor* we found that when an event that happened to one insured would have a severe effect on the other insured, it showed that there was not independence. *Caylor*, 121 T.C.M. (CCH) at 1214. The Commissioner presents us with two hypotheticals to illustrate the "cascade of losses" that a single event could cause under multiple policies. One example he provides is how the Caputo's stores would suffer the same type of loss in the event of a regulatory change.

As we have stated, the policies don't need to be completely independent of each other to demonstrate independence. "[P]erfect independence of risks is not required." *R.V.I. Guar.*, 145 T.C. at 230. Though we can imagine scenarios where the policies could overlap, the Commissioner's own expert Meyer credibly testified that there were plenty of instances and situations where the risk between the policies was not correlated—an employee selling liquor to a minor resulting in a fine at one Caputo's store, an employee at a different store mishandling a catering tray and poisoning a customer, or a third employee creating a situation hazardous enough to be a fire code violation in a building that is owned by one of the real-estate entities.

With his own witnesses repeatedly testifying in support of the Prestas' positions, we are mostly left with the Commissioner's hypotheticals on brief to undermine what his own expert testified were uncorrelated risks. Based on the peculiar record, we find that the policies were sufficiently independent to count as distributed risk.

### c. *Were the Independent Risk Exposures Sufficient?*

To summarize, we find on the facts of these cases that the following independent exposure units existed over the years:

| [*49]   Exposure Unit Type | Number of Exposure Units |
|---|---|
| Customer Transactions | 4.5 million[43] |
| Products Sold | 50,000 |
| Employees | 1,023–2,183 |
| Store locations | 6–8 |
| Suppliers | 0–1 |
| Insured Entities | 17–19 |
| Insured Policies | 11–14 |
| **Total** | **4,551,057–4,552,225** |

Here, we have a total of 4,551,057–4,552,225 exposure units. In previous cases we have found the following to be insufficient:

| Avrahami | Syzygy | Reserve | Caylor |
|---|---|---|---|
| 7 types of Policies | 8 policies | 11 to 13 policies | 7 policies |
| 4 entities | 1 entity | 3 entities, 17 employees, some machinery and 12 mines | 1 to 12 exposures per policy |

Compared to the cases where we found sufficient exposure units:

| R.V.I. | Rent-A-Center | Securitas | Harper Group |
|---|---|---|---|
| 714 insured parties | More than 14,000 employees | 200,000 employees | 7,500 customers |
| More than 754,000 passenger vehicles | 7,000 vehicles | More than 2,000 vehicles | More than 30,000 shipments |
| More than 2,000 real estate properties and more than 1.3 million commercial equipment assets | 2,600 stores | Provided guarding, alarm system installation, and cash handling services | 260,000 air shipments, 18,000 air flights, and 40,000 shipments on more than 3,000 ocean trips |
| 1 policy type | 3 policy types | 5 policy types | 2 policy types |
| 2,056,715 exposure units | 23,603 exposure units | 202,005 exposure units | 358,502 exposure units |

---

[43] As we noted, this is a proxy for actual customers in the store. The actual number of exposure units is much higher.

**[*50]** Looking at the independent exposure units generated from customer transactions alone, CFM was subject to over 200 times the exposure units we have found sufficient in previous cases.[44] Still, the Commissioner wants us to find that the law of large numbers is not satisfied.

We are not inclined to disregard thresholds set by caselaw absent a reason such a high number of exposure units is insufficient to satisfy risk distribution. We stress again that the experts *on both sides* provide us with no reason to believe these standards have not been met. At trial Angelina and Meyer agreed that for some, if not all, of the policies, there was adequate risk distribution. The Commissioner's own expert even testified that for certain policies as few as 30 exposure units would be sufficient to adequately distribute risk. This is the record we have, and so we find that there were sufficient independent exposure units for the law of large numbers to apply and find that the policies CFM issued sufficiently distributed risk.

This is a startling conclusion. In a recent microcaptive case involving an insurer of medical practices, we looked at the number of entities and the number of doctors—not the number of doctor-patient visits. *Swift*, T.C. Memo. 2024-13, at *29–30. Given the stakes involved in microcaptive-insurance cases, it is to be expected that taxpayers will try to define risk exposures in such a way as to get the numbers up. (As the old entomological couplet asserts, "Great fleas have little fleas upon their backs to bite 'em, and little fleas have lesser fleas and so *ad infinitum*." Augustus De Morgan, *A Budget of Paradoxes* (2d ed. 1915)). It is always possible to split a risk into more risks—consider a car-rental agency with a single car and ten customers a year. Is that one exposure, or ten, or is every intersection or every parking lane a toddler might race across or every tree driven past that could be run into, its own risk exposure?

In *Swift* we had a record that included expert testimony about what is generally regarded in the industry as a single risk exposure. The parties' experts disagreed, but a "majority" of them, including one for

---

[44] The number of insured entities and the number of storefronts, as well as the number of policies, were sufficiently independent to count as independent risk exposures. Together these add up to only 51,057–52,225 exposure units. Less than 1% of those generated by customer transactions alone. Having found the customer transactions to be appropriate independent exposure units, the question of whether these three units are independent is relatively inconsequential in our overall determination of whether there were sufficient independent risk exposures.

**[\*51]** the taxpayers themselves, agreed that the industry standard was to treat each doctor as a single risk exposure. *See Swift*, T.C. Memo. 2024-13, at \*30. We went with the majority of experts in *Swift*. *Id.* But in these cases, we have expert witnesses who by and large agreed with each other—and the Prestas.

This sometimes happens in litigation. In one of the only cases that allowed tax affecting[45] in the valuation of an asset, we ended up with a record in which "respondent objects vociferously in his brief to petitioner's tax-affecting, [while] his experts are notably silent." *Estate of Jones v. Commissioner*, 118 T.C.M. (CCH) 143, 153 (2019). On that record, we used tax affecting. But, as we did in *Estate of Jones*, we will also state plainly here that we have to decide cases on the basis of the record before us. Our factfinding from such peculiar records is unlikely to feed precedents in the future.

### B. *Commonly Accepted as Insurance*

As we noted in *Caylor*, this criterion begs the question: "[H]ere—we say something's not insurance because it doesn't look enough like something we do say is insurance—but it is one of the four criteria precedent tells us to look for."[46] 121 T.C.M. (CCH) at 1215.

There is no fixed list of factors we look for. But we usually start by looking at whether a company is formally organized and regulated as an insurance company. *See, e.g.*, *Patel*, T.C. Memo. 2024-34, at \*46. Formal compliance with some jurisdiction's regulations is not by itself enough, however, because what may look like an insurance company on paper may not behave as one in real life. So we also look to see whether a company:

- backed into premiums or charged unreasonable premiums;

- issued valid and binding policies or issued them only after the coverage period;

- handled claims in an irregular way;

---

[45] Tax affecting is a method of valuing a corporation by reducing its earnings to reflect its cash flow by a hypothetical corporate-level tax.

[46] In other words, we must determine to what extent CFM partakes in the form of "insurance." *See generally* Plato, *Meno, Parmenides, and Theaetetus* (Benjamin Jowett trans., 2008 ed.) (explaining Socrates's theory of the forms).

**[\*52]**

- had no or very few employees or absentee owners; and

- failed to engage in due diligence to determine if it was adequately distributing risk.

*Caylor*, 121 T.C.M. (CCH) at 1215–16; *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1486–87.

## 1. *Formal Operation*

CFM was organized, licensed, and regulated as an insurance company in Utah. Each year, that state's regulators reviewed CFM's insurance operations and its audited financial statements and statements of actuarial opinions, and each year renewed its license. CFM met Utah's capitalization requirement. *See* Utah Code Ann. § 31A-37-204 (West 2015). The Utah Insurance Department also reviewed CFM's operations and discovered no issues with capitalization, solvency, and compliance with its regulations. CFM properly obtained approvals for changes to its business plan and coverages. CFM underwent a limited-scope audit and no issues were found.

The Commissioner does not contest that CFM was formally organized and regulated as an insurance company, but instead argues that it failed to behave as one.

## 2. *Premium Calculations*

In *Caylor*, we found that backing into premiums instead of using historical loss data to price policies suggested that a company was not operating as an insurance company. *Caylor*, 121 T.C.M. (CCH) at 1216. In that case, the insurer started with a budget, $1.2 million, and the policies were priced around the budget. *Id.* The ten years of loss history that the company experienced were not taken into account despite expert testimony that such a factor was a common consideration in pricing policies. *Id.* We recognized that the insurer may have been hesitant to use the loss history since ten years may have been insufficient to produce an adequate measure of risk, but we found its failure even to consider that history to be one clue that it was not operating as an insurance company. *Id.*

In these cases CFM's premiums were also very close to, but never more than, $1.2 million. We think this is sufficient for us to find that it

**[\*53]** is more likely than not that the premiums, though calculated individually, were determined within a specific budget. And there is nothing in the record that suggests CFM ever consulted its own history of losses in setting premiums each year. This is one sign that CFM did not operate as an insurance company.

We also need to look at whether those premiums were reasonably similar to premiums charged in arm's-length transactions. The reasonableness of premiums depends on their relation to the risk of loss and whether the insurance company actually determined them. *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1474–75.

The Prestas presented us with two sets of computations for what their experts calculated as reasonable premiums for each policy for 2012 and 2013, and one set of comparable premiums for 2014 and 2015. The premium calculations were done by an actuary, Ekdom, who helped to revamp CFM's underwriting process starting in 2012, as well as Rhodes, a licensed actuary. The premiums they calculated were based on the specific policies that CFM had for each year. The total policy premiums they determined for each year, compared to those determined by Inman and charged by CFM are the following:

| Year | Inman | Ekdom (90th) | Rhodes (85th) |
|------|-------|-------------|--------------|
| 2012 | $1,199,136 | $1,116,031 | $1,177,000 |
| 2013 | 1,199,136 | 1,119,042 | 1,071,000 |
| 2014 | 1,196,148 | 1,123,212 | 994,000 |
| 2015 | 1,199,023 | 1,154,459 | 999,000 |

The Commissioner argues that the Prestas can't fix Inman's mistakes by bolstering her calculations with corroborating premium calculations. He claims that Inman's original premium calculations left a "black box" of questions since Inman did not testify about on how she calculated every factor she put into the equation for every policy for every year.

Inman testified generally as to what the different factors plugged into the equation were and also went into detail on how she determined the final numbers. We find her testimony credible and also sufficient to establish that the process through which the premiums were calculated was reasonable. Looking at whether the end result matches up with the reasonable premiums calculated by other experts, we think, is therefore

**[*54]** a good indicator of whether the premium calculations, and not just the process, were reasonable.

As Rhodes credibly testified, actuaries and underwriters looking at the same data are going to come up with different answers and in some cases those differences can be large. Actuarial work produces a range of potential answers. Some of the premiums that CFM charged were higher than those calculated by Ekdom and by Rhodes, some of them were lower, and some of them were in between. In general, we find there were no premiums in any of the years that we found to diverge drastically from the reasonable premiums that Ekdom and Rhodes calculated independently.

As with the question of risk distribution, our factfinding about the reasonableness of the premiums CFM charged is heavily influenced by the Commissioner's failure to ask any of his experts to calculate what reasonable premiums would have been. He tries to fill this gap by argument in his brief that the calculations that the Prestas presented are not reliable, but his own expert testified that she had no idea whether 50% or more of the premiums were reasonable because she had not been asked to make any calculations. She did some calculation that was a flawed comparison of the rate-on-line for the premiums charged by CFM to the premiums charged for the commercial policies purchased by Caputo's New Farm.[47] What's more, the only critique that Garland had about Inman's analysis was the captive-risk factor, an analysis which we found reasonable.[48]

The Commissioner presents us with *his own* rate-on-line comparison with commercial policies, something that we have looked to in previous cases to determine whether there was an arm's-length transaction. *See, e.g.*, *Rent-A-Center*, 142 T.C. at 12. We found in *Rent-A-Center* that comparing commercial insurance companies' premiums to surplus ratio with captives was useless since commercial insurance companies have lower premium to surplus because they face more competition. *Id.*

---

[47] Notably the commercial policies that Garland discussed cover different perils from the policies issued by CFM.

[48] We don't think that a captive risk factor is appropriate when it is used to simply juice the premiums. However, when, as here, the factor was used to actually determine the level of risk the individual company bore, and we have a credible expert testimony explaining not only how that factor was determined, but also how most of the considerations were weighted for each year, we find it reasonable.

**[*55]** The Commissioner not only disregards the rate-on-line analysis prepared by his own expert but also his expert's own testimony on what an adequate rate-on-line analysis would consist of for a captive policy. Garland testified that a rate on line to comparable commercial policies would not be appropriate to use when comparing them to captive-insurance policies. She went on to explain that a general-liability policy would be the best comparison for this type of rate-on-line analysis. Not only did the analysis the Commissioner provided on brief lack support from an expert, but it was actually performed contrary to the way his own expert testified to be most adequate. As with risk distribution, it is very difficult to find for a party on such a complicated issue when the actual record before us holds expert testimony from both sides that contradicts the facts the party seeks to establish.

We have previously declined to substitute the Commissioner's judgment for that of a credible expert. *Acuity*, 106 T.C.M. (CCH) at 246. We will do so again here.[49]

The Commissioner argues we should look beyond the premiums charged to the evolution of the premiums over time to determine if they are reasonable. In the 2012 and 2013 collection-risks policies there was a $300,000 limit for a $30,560 premium. The 2014 version provided the same $300,000 limit but the premium increased to $47,186. Caputo's New Farm had not submitted any claims and the risk profile didn't change, so the only difference appears to be that Inman priced the policy outside Artex's database and for 2014 she priced the policy using that database. The administrative-actions policy limit went from $250,000 in 2012 and 2013 to $500,000 in 2014 to $200,000 in 2015. The loss-of-key employer policy limit dropped from $1 million to $500,000 in 2012 and 2013. The employment practices liability policy limit changed from $300,000 in 2012 and 2013 to $750,000 in 2014 and 2015.

We have considered such odd fluctuations in other cases, but it was but one of many factors that led us to conclude the premiums were not reasonable. *See Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1488–89. We do agree that these fluctuations weigh in favor of the Commissioner, but in light of the credible alternative reasonable premiums that CFM's experts provided us, and the absence of such premium calculations from

---

[49] The Commissioner also claims that comparable commercial coverage was available for less, and CFM's policies were both more expensive and more restrictive in their coverage. But on this record, we have no expert testimony to corroborate the Commissioner's assertions and at least credible expert testimony to the contrary.

**[*56]** the Commissioner's own experts, we give them little weight one way or the other.

The history of how CFM collected these premiums, however, does bolster the Commissioner's position that it was not acting like a normal insurance company. None of the invoices identified a specific due date, but they all contained options for semiannual, quarterly, and monthly payment plans. The invoices state: "[P]lease note that this is the only invoice you will receive regardless of the payment plan you select." We agree with the Commissioner that this means Caputo's New Farm was obligated to pay the premium according to one of the payment plans provided on the invoice. The 2012 payment, however, was not sent until December 2012; the 2013 payment was not sent until December 2013. This made both years' premiums untimely.

The general terms and conditions applicable to the 2014 policies stated that the insured was "responsible for the payment of all premiums quarterly but in no event later than the expiration of the Coverage Period." Caputo's New Farm made a partial payment in July 2014 and the remainder in December 2014, thus violating one requirement and barely meeting the second.

The 2015 terms and conditions required only that premium payments be made before the end of the coverage period. Caputo's New Farm paid them in December 2015. So we'll find this payment timely.

The Commissioner does not argue that the losses were not satisfied, and CFM did timely pay out claims to Caputo's New Farm.[50] The premium payments it received for two of the four years, however, were not timely. And allowing payment even at the very end of a coverage year is eccentric. We find this weighs against treating CFM as a normal insurance company.

### 3.    *Valid and Binding Policies*

A policy is binding if it identifies the insured, contains an effective period for the policy, specifies what is covered by the policy, states the premium amount, and is signed by an authorized representative. *See Securitas*, 108 T.C.M. (CCH) at 497. In microcaptive cases we look to see if a company timely issues its policies. *Caylor*, 121 T.C.M. (CCM)

---

[50] The Commissioner argues that CFM routinely paid claims without cause. We discuss below CFM's claim-handling process as it relates to whether CFM operated as an insurance company and so there is no need to do so again.

[*57] at 1216. We have also looked at factors beyond whether the policies are simply binding, such as whether there are conflicting policy terms or whether the policies were simply cookie cutter with little relationship to the taxpayer's business. *Avrahami*, 149 T.C. at 194 (examining conflicting policy terms); *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1487 (describing that policies were cookie cutter and not necessarily appropriate).

### a. *Untimely Policies*

In *Caylor*, we found that billing for premiums after the end of the coverage period was a sign that the company did not operate as an insurance company. *Caylor*, 121 T.C.H (CCM) at 1216. In that case, it led us to believe that "[w]riting and delivering 'claims made' insurance policies *after* the claim period is . . . abnormal and is to any reasonable observer just plain silly." *Id.* We relied on more than just intuition; our finding was based on the testimony of the experts at trial. *Id.*

Here Angelina testified that it is common for a binder to hold a policy in place. Under Utah law a binder is "a writing which describes the subject and amount of insurance and temporarily binds insurance coverage pending the issuance of an insurance policy."[51] Utah Code Ann. § 31A-21-102(1) (West 2015). The purpose of a binder is "to evidence that the insurance coverage attaches at a specified time and continues . . . until the policy is issued or the risk is declined and notice thereof is given." *Syzygy*, 117 T.C.M. (CCH) at 1175 n.27 (quoting *MDL Cap. Mgmt., Inc. v. Fed. Ins. Co.*, 274 F. App'x 169, 170–71 (3d Cir. 2008)).

The Seventh Circuit, however, has held that in certain cases binders are "meaningless" and provide "no benefits" to the insured where the insurer purported to bind a policy but had not sent any policy terms to the insured. *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 634–35 (7th Cir. 1992). We acknowledge that the situation is a bit mixed here, as the policies for 2013 and 2014 were evergreen, meaning that they were automatically renewed. But the 2012 the policies were issued for the first time, and the policies for 2015 were not evergreen, but reissued.

We find that it more likely than not that the only binders that could possibly be valid were the ones issued for 2013 and 2014. Even so,

---

[51] This definition of a binder is not directly applicable to captive-insurance companies incorporated in Utah, but we find is common in the industry.

**[\*58]** this does not speak to whether they were sufficient for us to overlook the timing of when those policies were actually issued. In *Syzygy*, we considered whether issuing binders was enough to create a valid and binding policy, when the insurer did not timely issue an actual policy. 117 T.C.M. (CCH) at 1175. We noted expert testimony that explained that in the insurance industry it's not unusual for policies to arrive late, but that most of the binders are timely. *Id.* Nevertheless, we found that "the failure to timely issue *even a single* policy weighs against the arrangement being insurance in the commonly accepted sense." *Id.* (emphasis added).

We acknowledge that *Syzygy* didn't quite provide us with a definition of what constitutes timely issuance in all cases. We do find in these cases that for 2012 and 2015 CFM did not issue the policies until the coverage period was over, and for 2013 the policies were not issued until four days before the end of the coverage period. We therefore find that for at least three of the four years CFM did not timely issue its polices. The only policies that we could possibly find timely were the 2014 policies that CFM issued with five months left in the policy year. This is better, but we still don't find them timely.

Utah has laws that pertain to binders with respect to noncaptive insurance policies. The law states that "[n]o binder is valid beyond the issuance of the policy as to which the binder was given, or beyond 150 days from the binder's effective date, whichever occurs first." Utah Code Ann. § 31A-21-102(3). We acknowledge that this law does not govern microcaptive-insurance companies; however, if a binder expires 150 days after the effective date absent a policy, it seems that at least for some types of insurance in Utah, presumably, a policy to be timely must be issued within 150 days of the effective date. The 2014 policy was issued in July 2014 with an effective date of January 1, 2014. That's more than 150 days.

Neither the Prestas nor the Commissioner provided us with any specific testimony on what makes a policy timely. Our purpose in looking at timeliness, however, is not to find whether a policy is legally binding or not, but instead whether CFM was behaving like a normal insurance company. Given Utah's law on the subject, and the generally acknowledged irregularity of issuing policies after all or most of a policy year is over, we find that CFM's untimeliness is another sign that it was not behaving as a normal insurance company would.

**[\*59]**                        b.      *Ambiguity*

For all of the years before us, the policies had conflicting terms. They simultaneously included a list of the insureds, but also identified "you" as the "Named Insured." This makes it unclear as to whether the policies for those years that referenced "you" referred to only the Named Insured, or all of the entities that were covered by the policy.

We also find that many of the policies failed to define material terms or lacked criteria to determine if a particular loss was covered. The 2012 key-supplier policy, for example, did not define "key supplier." The crisis management/reputation risk policies for 2012 and 2013 did not provide criteria to determine when a reputation was damaged. The key-employee policies did not define the criteria they imposed for what constitutes a key employee for any of the four years.[52]

And then there was the business-interruption DIC policy. The 2014 policy provided coverage for a long list of events but did not define any of the terms used, including "economic sanctions" and "denial of access" in the 2014 policy. Most alarming is that the 2014 and the 2015 business-interruption DIC policies purported to cover losses from terrorism, pollution, and dishonest acts by employees, but also included a blanket exclusion for claims based on those very conditions.

We recognize that discerning whether a policy is "valid and binding" includes looking at "policy ambiguities and conflicting terms and how they fit in with the spirit of a transaction." *Syzygy*, 117 T.C.M. (CCH) at 1175. Though "ambiguous and conflicting terms do not prevent every policy from being insurance for tax purposes," as we noted in *Syzygy*, *id.* at \*44 (citing *Merck & Co. v. United States*, 652 F.3d 475, 481 (3d Cir. 2011)), when we are dealing with a related-party transaction, we look at the policies and their terms with heightened scrutiny.

---

[52] For 2012 a key employee was defined as "any person on who you depend to either generate a significant portion of your revenue or provide intellectual services on which you depend," but neither "depend" nor "significant portion" was defined.

This definition was amended for 2013, 2014, and 2015 to define a key employee as "material" or "vital," but those terms were not defined.

**[\*60]**      4.      *Claims Handling*

Handling claims as an insurance company would ask us to look for two things: Did CFM have procedure in place for handling claims? And how did it actually handle claims?

a.      *CFM's Procedure*

A lack of procedure for processing claims is a sign that a company is not behaving as a normal insurance company would. *See Avrahami*, 149 T.C. at 188–89. In these cases CFM outsourced everything to Artex, and from 2012 until March 2014, we find that Artex did not even have a claims department or any licensed claims adjusters. It wasn't until 2013 that Artex drafted two documents to provide instructions for how to handle claims, even specifying where on its network a notice of claim is saved. Artex then hired Leavitt at the end of March 2014. When he was brought on, Artex still had no formal claims manual. Leavitt said that Artex required all claims to have a notice-of-claim form to formally document the report of a claim or loss. The notice-of-claim form was to be filled out by the insured. The insured was supposed to prepare the notice-of-claim form as soon as possible after a covered loss occurred. Then if Artex approved the claim, it was supposed to prepare a proof-of-claim form that identified the responding policy, date of loss, and amount to pay.

We acknowledge that that there are no bright-line tests for whether a claims process or procedure is "normal". We also find that over the years Artex worked to improve its claims-handling infrastructure. Angelina testified that Artex's process was somewhere between very sloppy and perfect. The Commissioner's own expert Hogan even admitted during trial that the claims process is not something that is etched in stone but rather something that varies from claim to claim.

In light of Hogan's testimony, we credit Leavitt's and Angelina's testimony that CFM's claims processing was adequate when compared to other insurers' processing. We don't find that this weighs against the Prestas, but the informal nature of the procedure does not weigh in their favor either. We think this is neutral.

b.      *CFM's Claims Processing in Reality*

CFM's actual processing of claims is a different story. The failure of an insured to submit claims is a strong sign that a company is not

**[\*61]** operating as an insurance company. *See id.* at 192. An insurance company's approval of claims without supporting evidence makes it less likely that the company operated as an insurance company. *Id.* (insurer functioned differently from a normal insurance company as "[i]t dealt with claims 'on an ad hoc basis.'") An insurer that bends procedure to meet the demands of its insured is not acting like a normal insurance company. *Caylor*, 121 T.C.M. (CCH) at 1215. In *Caylor*, the insurer asked the insured for more information on a claim when it was received. *Id.* Though we found requesting additional information to be consistent with the common notion of operating as an insurance company, what we found abnormal was that instead of providing the information, the policy holder simply told the insurer to pay the claim. Which it then did. *Id.*

We note first that the insureds here did not submit even a single claim in either 2012 or 2013. They did submit a total of five claims in 2014 and 2015, but CFM handled them all in an unusual way. Three of the five claims were paid before a notice-of-claim form was submitted and before CFM prepared a proof-of-claim form to authorize payment. For one of the claims CFM signed a proof-of-claim form before it had issued the policy. And when that claim showed a loss in excess of the policy limit, Artex just changed the policy limit. We find that this is most unlike what a normal insurance company would do.

The last of these five claims had even more serious problems. It was initially submitted under the regulatory-change policy for costs which various Caputo's entities incurred to come into compliance with PCI requirements. They submitted an invoice for the claim with a loss amount of around $1 million. Leavitt did not believe that PCI noncompliance was a covered loss and so denied the claim. The Prestas then argued that new information revealed that this expenditure wasn't incurred to come into PCI compliance but to secure the Prestas' network after a cyberattack.

As the story shifted, so did CFM's willingness to pay the claim. With this new story, Inman informed Caputo's New Farm that the claim could be covered under the mechanical-breakdown DIC policy and or other-business-interruption DIC policy. This meant that an underwriter was essentially overruling the claims adjuster. We find that this is actually contrary to common industry practice.

We therefore find that Artex managed CFM in a way that reaped optimal benefits for the Caputo's entities—something we find is contrary to what an actual insurance company would do. Paying a claim before

**[\*62]** an insured files a notice of claim or an insurer drafts and reviews a proof of claim is a strong signal that CFM was not operated as an insurance company. The Prestas argue that we shouldn't expect CFM to operate perfectly at all times, and we can agree with that. But when every single claim filed in the years before us has material defects in the way it was processed, the strength of that signal only increases.

Though the processing procedures don't by themselves mean that CFM wasn't an insurance company, we think that the way the claims were handled and processed ultimately weighs heavily against our finding that CFM operated as an insurance company.

### 5. *Absentee Owners*

We found in *Reserve Mechanical* that an insurer with no employees of its own and a chief executive officer, president, and 50% owner with no knowledge of the insurance business weighed against finding the company was operating as an insurance company as commonly understood. *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1486–87. As in these cases, the insurer in *Reserve Mechanical* was managed by an outside company. *Id.* at 1478. We reasoned that when an insurer fails to participate in the structuring or execution of an insurance transaction, it's a sign that the company did not operate as an insurance company. *Id.*

While CFM was managed by Artex, Presta was the 50% owner and president of the company. He testified at trial that he knew little of the operations—he even forgot that he had appointed himself as CFM's president. We don't think that outsourcing the operation of a captive undercuts in all cases the characterization of a company as an insurance company, but when the president of the company doesn't even know that he is the president, something is off.

### 6. *Due Diligence*

A lack of due diligence is another sign that a company does not operate as an insurance company. In *Reserve Mechanical*, we found a lack of due diligence in the fact that a feasibility study to analyze the benefits of a captive was completed only after policies from the insurer had already been issued. *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1487. The Commissioner argues that CFM did not adequately engage in due diligence since the feasibility study here had boilerplate language instructing Caputo's to consult outside accountants to ensure the plan

[*63] adequately distributed risk.[53] Though there may have been a standard disclaimer CFM, unlike the insurer in *Reserve Mechanical*, had Artex perform a feasibility study which was completed before any policies were issued. We find that CFM engaged in adequate due diligence in creating the captive. But we also do find that the ambiguities and inconsistencies in the policies are quite problematic.

Overall, we think that CFM was organized and regulated as an insurance company and was adequately capitalized. On the basis of the extremely unusual battle of the experts in which the Commissioner's did not take up arms on the issue, we also find that CFM charged reasonable premiums. But these factors don't outweigh the other facts that show CFM failed to operate as an insurance company normally would. It did not regularly issue valid and binding policies or collect premiums in a timely way for most of the years and policies at issue. The haphazard handling of the few claims that CFM received is a particularly strong sign that it did not operate the way an insurer would.

It's a much closer call than is usual in microcaptive cases, but in the end we find by a preponderance of the evidence that CFM was not offering something that would be commonly accepted as insurance. This means we find CFM ineligible to make a section 831 election on its returns. This also means that the Caputo's entities were not entitled to deduct the payments sent to CFM as "insurance".

IV.    *Unwinding the Transaction*

Since CFM does not qualify as an insurance company under the Code, the next question for us to answer is whether CFM is liable for tax on the money it received from the Caputo's entities. The Commissioner attempts to eat his cake and have it too, arguing that not only should we disallow the deductions taken by the Caputo's entities, but we should also tax the money transferred to CFM. The Prestas, however, argue that we should unwind the transaction and characterize the payments

---

[53] The study stated that "while Caputo's has more than the minimum of twelve entities insured as suggested under Rev. Rul. 2002-90, it may not meet the technical requirement of that Ruling by having all entities paying under 15% of the premium. Caputo's is advised to seek the advice of a qualified tax advisor to ensure that the risk distribution occurring between these 18+ entities is sufficient for tax purposes. Artex is not a qualified tax advisor."

**[*64]** to CFM as either capital contributions, or alternatively payments to a loss reserve.[54]

The problem with recharacterizing a payment as a capital contribution is that it requires us to find that the Caputo's entities intended the payments to CFM to be treated as capital contributions. *See Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1490 (citing *Bd. of Trade v. Commissioner*, 106 T.C. 369, 381 (1996)). The intent of the Caputo's entities, however, was to pay insurance premiums. Presta testified at trial that the whole reason for creating CFM was to protect the Caputo's entities against the unforeseen. Since the premiums were not intended to be capital contributions, we can't recharacterize them.[55]

Though we can't treat the premium payments as capital contributions, the Prestas argue that we should still unwind the transaction and treat them as contributions to a loss reserve. This would not be the first time we did so. In *Humana* the Sixth Circuit agreed with our reasoning when we found premium payments were not deductible, but "they likewise should be considered additions to a reserve for losses." *Humana Inc. v. Commissioner*, 881 F.2d 247, 251 (6th Cir. 1989), *aff'g in part, rev'g and remanding in part* 88 T.C. 197 (1987).

---

[54] The Prestas argue that the Commissioner has the burden of showing that these payments were not income because he characterized them as section 832 premium income in CFM's notice of deficiency. They also argue that this is a case of unreported income which imposes an additional burden on the Commissioner to connect the income to an income-producing activity. The notice of deficiency, however, stated that the payments were includible in CFM's income under section 61, which includes all other income. This means the Commissioner is not raising a new issue, and we will not shift the burden of proof. The Commissioner connected CFM to income by producing bank statements showing the deposits. *See Naylor v. Commissioner*, 105 T.C.M. (CCH) 1122 (2013) (respondent established actual receipts with account statements). The parties have also stipulated that the amounts were wired to CFM for every year at issue. *See Ward v. Commissioner*, 69 T.C.M. (CCH) 3025 (1995) (respondent established actual receipts where parties stipulated to receipt of funds), *aff'd sub nom. I&O Publ'g Co. v. Commissioner*, 131 F.3d 1314 (9th Cir. 1997).

[55] The Prestas cite *Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 350 (2013) (citing *Carnation Co. v. Commissioner*, 640 F.2d 1010, 1013–14 (9th Cir. 1981), *aff'g* 71 T.C. 400 (1978)), where we held that even though an insurer "did not provide insurance during the subject years, . . . the funds that it received as insurance premiums could not have been received as such but were instead received as contributions to its capital."

In these cases, there is no evidence that the premium payments were intended to be anything other than what they were.

**[*65]** The Commissioner contends that nothing in *Humana* requires that we recharacterize CFM as a loss reserve, and he is right. We have already rejected this recharacterization in two other cases. In *Syzygy*, we found that "there [was] no evidence that any such recharacterization [was] appropriate." 117 T.C.M. (CCH) at 1176. We cited to *Reserve Mechanical* where we rejected the recharacterization of the payments as capital contributions and found the petitioners "failed to specify why the payments might otherwise be treated as nontaxable deposits." 115 T.C.M. (CCH) at 1490.

For us to recharacterize the transaction, the Prestas must prove that (1) the substance of the transaction did not match the form, and (2) the form of the transaction "was not chosen for the purpose of obtaining tax benefits . . . that are inconsistent with those the taxpayer seeks through disregarding that form." *Complex Media, Inc. v. Commissioner*, 121 T.C.M. (CCH) 1089, 1104 (2021). In both *Syzygy* and *Reserve Mechanical*, we found that the taxpayer failed to meet this burden. *Syzygy*, 117 T.C.M. (CCH) at 1176; *Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) at 1489.

Our finding that CFM does not qualify as an insurance company necessarily means that the substance of the transaction did not match its form. The only question is whether the Prestas chose to create a captive-insurance company instead of a loss reserve because of the deductions their entities could claim for the insurance premium payments. Huish testified that in the presentation to potential clients that Gallagher put on, the clients were informed of the advantages and disadvantages of setting up a captive insurer. He stated that he discussed with prospective clients how in lieu of setting up a captive insurance company, they "could still set up this reserve account and not take the tax benefit."

There is no evidence in the record to indicate that the Prestas structured the payments as captive insurance instead of a loss reserve for any reason other than the additional tax benefits that a captive would have provided. Huish's testimony makes it more likely than not that the Prestas were at a minimum informed that choosing to create a captive-insurance company instead of a loss reserve was a better option specifically because of the greater tax benefits it provided. Because of

**[\*66]** this, we find that the Prestas have failed to meet the burden of proof necessary to recharacterize the transaction.[56]

## V. *Penalties*

The Commissioner asserted section 6662(a) penalties against the Prestas for 2012, 2013, and 2015. Section 6662(a) and (b)(2) imposes a 20% penalty for any underpayment of tax required to be shown on a return that is due to "[a]ny substantial understatement of income tax." The Commissioner has both a burden of proof and a burden of production here. His burden of proof is to show that he complied with section 6751. On August 3, 2018, Revenue Agent Van Nguyen finalized a substantial-understatement penalty lead sheet. Group Manager Ted Spencer signed it on August 6, 2018 and the IRS mailed a Letter 950 that listed all of the penalties at issue, including the penalties for substantial understatements. Before mailing the letter, Nguyen's group manager, Ted Spencer, approved the penalties by signing the letter. That's enough. *See Chai v. Commissioner*, 851 F.3d 190, 215–23 (2d Cir. 2017), *aff'g in part, rev'g in part* T.C. Memo. 2015-42; *see also Graev v. Commissioner*, 149 T.C. 485, 492–93 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).

The Commissioner has the burden of production on the merits of the section 6662(a) penalties. *See* § 7491(c). He shoulders it here with simple arithmetic:

| Year | Reported Taxable Income | Taxable Income Required to Be Shown | 10% of the Taxable Income Required to Be Shown | Understatement | Commissioner's Burden of Production Satisfied? |
|---|---|---|---|---|---|
| 2012 | $1,623,966 | $2,462,311 | $246,231 | $838,345 | Yes |
| 2013 | 433,987 | 923,091 | 92,309 | 489,104 | Yes |
| 2015 | 2,617 | 50,606 | 5,060 | 49,989 | Yes |

---

[56] The Prestas also argued that recharacterizing the payments to CFM as a loss reserve would entitle the Caputo's entities to adjustments for the previous years in which they reported the insurance payouts as taxable income. We don't need to address this issue since we have already determined that recharacterization is not appropriate.

**[\*67]** On the basis of these numbers, the Prestas substantially understated their income tax liabilities for all of the years.

The Prestas argue, however, that they claimed the deductions reasonably and in good faith. This is a defense to the section 6662(a) penalties. *See* § 6664(c)(1); Treas. Reg. § 1.6664-4(a). The regulation tells us to look at all the relevant facts and circumstances. *See* Treas. Reg. § 1.6664-4(b)(1). One circumstance where the exception applies is "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.* The most important factor for us to look for is the extent of the taxpayer's efforts to assess the proper tax liability. *See Higbee v. Commissioner*, 116 T.C. 438, 448–49 (2001). Reasonable cause requires a taxpayer to exercise ordinary business care and prudence as to the disputed items. *See United States v. Boyle*, 469 U.S. 241, 246 (1985); *see also Hatfried, Inc. v. Commissioner*, 162 F.2d 628, 635 (3d Cir. 1947); *Girard Inv. Co. v. Commissioner*, 122 F.2d 843, 848 (3d Cir. 1941); *Estate of Young v. Commissioner*, 110 T.C. 297, 317 (1998).

Proof of reliance on a professional's advice is another way of showing reasonable cause and good faith. Treas. Reg. § 1.6664-4(b)(1), (c). There is, however, a difference between tax preparation and tax advice. A tax preparer is "any person who prepares [a return] for compensation." § 7701(a)(36)(A). A tax adviser, in contrast, is a person who analyzes an issue and communicates his conclusions to the taxpayer. *See* Treas. Reg. § 1.6664-4(c)(2); *see also Woodsum v. Commissioner*, 136 T.C. 585, 592–93 (2011) (advice reflects adviser's analysis or conclusion and taxpayer relied in good faith on adviser's judgment).

The caselaw lists three factors we look at to decide whether this defense exists.

- First, was the adviser a competent professional who had sufficient expertise to justify reliance?

- Second, did the taxpayer provide necessary and accurate information to the adviser?

- Third, did the taxpayer actually rely in good faith on the adviser's judgment?

**[\*68]** *E.g.*, *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). Whether a taxpayer relied on advice and whether his reliance was reasonable hinge on the facts and circumstances of the case. *See* Treas. Reg. § 1.6664-4(c)(1).

The Prestas' accountant Hamilton Kwon worked at Miller Cooper & Co. Ltd. (Miller Cooper). He worked with the Prestas throughout the creation of CFM. He was a CPA with eighteen years of public accounting experience, and he credibly testified that before advising the Prestas on the creation of CFM, he informed himself about captive insurance and its taxation.

In 2012 Kwon provided Presta with advice regarding captive insurance as well as the tax implications of the transaction. Kwon opined that Presta was purchasing policies that covered insurable risks and paying premiums to a licensed insurance company, and that this made those premiums deductible business expenses. He communicated this advice to Presta before the first tax return reporting the captive insurance transaction was filed.[57] He arrived at the advice independently: He conducted his own research, consulted with the Miller Cooper service team including partner Ignacio Mendez, and considered technical resources. We find that the Prestas' reliance on him was reasonable.

We also find that Kwon took the following steps with the information that he was provided: He reviewed the information Caputo's provided to Artex, as part of the formation process, for accuracy, the engagement letter, and the Artex feasibility study, and he understood the captive would be, as it ultimately was, licensed and regulated in Utah, subject to that state's regulation. He also reviewed the captive policies for any coverage that seemed unusual for Caputo's business. Kwon had direct access to Artex, and he assessed Artex and gained comfort with its expertise regarding captive insurance. We therefore also find that Kwon received necessary and accurate information from Caputo's about the transaction and contacted Artex to assess its

---

[57] The Commissioner notes that Kwon did not review the feasibility study before giving his opinion. But this is not a requirement. In both *Avrahami* and *Syzygy* we found that the taxpayers reasonably relied on tax professionals and did not factor into our analysis whether those professionals reviewed the feasibility studies of the captive transactions. *Avrahami*, 149 T.C. at 207–08; *Syzygy*, 117 T.C.M. (CCH) at 1177.

**[\*69]** expertise to provide the advice. We also find that Kwon actually conveyed advice to the Prestas and did not simply prepare their returns.

While Presta has been very successful in the grocery and real-estate business, he is a man of humble beginnings—having worked at the Elmwood Park store from the age of thirteen—and has received no classroom education beyond high school. Other than dutifully paying his taxes and buying insurance coverage, he has no experience in the tax or insurance industries, so he did what any prudent businessperson would do: He found and relied on competent professionals. Presta felt Miller Cooper was a reputable public accounting firm and had no reason to doubt anyone at Miller Cooper, or their advice.

Kwon was a qualified tax professional and had adequate access to CFM's records. He was responsible in updating himself on the rules regarding captive insurance and informed Presta that upon forming CFM the Caputo's entities would be entitled to deduct premium payments. Presta reasonably relied on Kwon's advice. This alone is sufficient to find the Prestas are not liable for the accuracy-related penalties.

We also note that both when CFM was formed and when each of the returns at issue was filed, the validity of microcaptive insurance was an issue of first impression. *See Avrahami*, 149 T.C. at 207–08 (filed August 2017). When we first saw this issue, we ruled that the taxpayers' reliance on their adviser, an attorney, was in good faith. *See id.* We were sympathetic to the taxpayers and noted that we tend to decline imposing accuracy-related penalties "when there is no clear authority to guide taxpayers." *Id.* (first citing *Petersen v. Commissioner*, 148 T.C. 463, 481 (2017), *aff'd and remanded*, 924 F.3d 1111 (10th Cir. 2019); then citing *Williams v. Commissioner*, 123 T.C. 144, 153 (2004); and then citing *Hitchins v. Commissioner*, 103 T.C. 711, 719–20 (1994)). The absence of guidance available to the Prestas regarding the appropriate tax treatment of microcaptive insurance for the years at issue also helps us find the Prestas should not be liable for the accuracy-related penalties the Commissioner asserted against them.

CFM does not meet the definition of an insurance company under section 831 because it failed to operate as an insurance company as commonly accepted. The deductions that the Caputo's entities claimed for the premiums they paid to CFM were not deductible. The Prestas did not meet the burden of proof required for us to characterize the payments to CFM as something other than income under section 61. As

[*70] a result, CFM has an obligation to pay tax on the sums it received, and the Caputo's entities were not entitled to adjust their income to exclude the insurance payouts, and the benefits therefore cannot be passed through to the Prestas. We do, however, find that the Prestas reasonably relied on the advice of a competent tax professional when they took the positions they did on their returns and are not liable for any penalties.

*Decisions will be entered under Rule 155.*